**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | **Civil Action No.: _____** |
| **v.** | 5:22-cv-00644 (TJM/TWD) |
| **SYRACUSE UNIVERSITY,** | |
| **Defendant.** | |

<u>**COMPLAINT AND JURY DEMAND**</u>

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendant Syracuse University ("Syracuse" or the "University"), respectfully alleges as follows:

<u>**THE NATURE OF THIS ACTION**</u>

1.     This case arises out of the damaging actions taken and inadequate procedures employed by Syracuse in investigating and adjudicating erroneously with gender bias a complaint of sexual misconduct filed by Jane Roe[2] ("Roe") against Doe.

2.     Syracuse took egregious, biased, intentional, and discriminatory actions against Plaintiff throughout the University's Title IX sexual misconduct process, which ignored the specific facts of the case and rushed to find Plaintiff responsible as a male accused.

3.     Syracuse engaged in a sloppy and flawed investigation that was plagued by procedural inadequacies, which breached the University's own written procedures and prevented Plaintiff from having a meaningful opportunity to be heard.

---

[1] Plaintiff files herewith a motion to proceed under a pseudonym.
[2] Jane Roe refers to the complainant pseudonymously and is prepared to confidentially disclose her identity to the Court upon request.

4.      Fellow student Jane Roe brought forth false allegations of sexual misconduct against Plaintiff following a consensual sexual encounter, and the University distorted the facts uncovered throughout the investigation to fit Roe's nebulous narrative.

5.      Indeed, despite clear testimony from witnesses that Roe was not incapacitated, the Investigator and Hearing Officer minimized any evidence that could negatively affect Roe's credibility.

6.      As a result of the University's biased and flawed proceedings, Plaintiff was found responsible for nonconsensual sexual intercourse, and was sanctioned to expulsion from the University.

7.      By employing a gender-based presumption of Plaintiff's guilt, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

8.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition to Syracuse.

9.      Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## **THE PARTIES**

10.     Plaintiff John Doe is a natural person and citizen of the State of Maryland.

11.     Defendant Syracuse University, located in Syracuse, New York, is a private research institution of higher education.

12.     Defendant Syracuse receives federal funding. The total amount of federal funding is not publicly available.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court has also supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14.     This Court has personal jurisdiction over Defendant Syracuse on the grounds that it is conducting business and principally located within the State of New York.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Syracuse is considered to reside in this judicial district and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.      Background: The Effect of the "April 2011 Dear Colleague Letter" of the Department of Education's Office for Civil Rights on University Sexual Misconduct Policies**

16.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

17.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

18.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, NATIONAL PUBLIC                    RADIO                    (Feb.                    24,                    2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

19.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist*, Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015),

http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

20.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11)

21.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16)

22.     The DCL (at 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

23.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

24.     Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

25.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

26.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." OCR's April 2014 Q&A at 9, 12; http://www2.ed./gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

27.     The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at 31.

28.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

      (a)     "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

      (b)     may decide to eliminate all opportunities for "cross-examination" (p. 31); and

      (c)     must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

29.     Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

30.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

31.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014),   https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

32.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education,  https://projects.chronicle.com/titleix/  (last visited June 3, 2022).

33.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct. In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed:

"There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, NATIONAL PUBLIC RADIO (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

34.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings.  *See* Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them. Dana told NPR, "[c]olleges and universities are getting very jittery about it." *Id.*

35.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students. *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, CHRONICLE OF HIGHER EDUCATION (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529. For example, the article noted that different standards were being applied to male students versus female students: "[u]nder current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to

initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

36.     Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations.  *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

37.     The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university. Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students."  *Id.* The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid.* In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

38.     Colleges and universities including Syracuse, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, like Syracuse, limited procedural protections afforded to males, like John Doe, in sexual misconduct cases.

39.     On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available*

*at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

40.     DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

41.     Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

42.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.*  She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

43.     As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter."  Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, THE MIDDLEBURY CAMPUS (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

44.     On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Educ., Dear Colleague Letter (Sept. 22, 2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

45.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Educ., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (citations omitted) (emphasis added).

46.     In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

47.     The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.

48.     The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and *equitable* resolution of complaints of sex discrimination, including sexual misconduct." *Id.* at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid.* (emphasis added).

49.     The 2017 Q&A also requires investigators to "synthesize *all available evidence—* including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

50.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

51.     Likewise, the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.  *Id.* at 4; *see also id.* footnote 19 at 4.

52.     The 2017 Q&A suggests that the policies and procedures in place at Syracuse during the investigative phase of Doe's disciplinary proceeding—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

53.     On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All* (Nov. 16, 2018, 9:41 a.m.) https://content.govdelivery.com/accounts/USED/bulletins/21bcf5b.

54.     Despite a different direction announced by the Trump Administration, colleges universities, and educational programs including Syracuse mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

55.     In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding the Frame: Institutional Responses to Students Accused*

*of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct). The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

56.     In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

57.     On May 6, 2020, the United States Department of Education released new Title IX regulations, which carried the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html)

58.     The new Title IX regulations provide respondents certain procedural rights, including without limitation: (i) a presumption of innocence until a finding of responsibility is made; (ii) the right to be provided with a copy of the investigative report produced in the matter

13

and a minimum of ten days in which to respond to the investigative report. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf)

59.    As will be detailed below, Syracuse revised its policies in or about Fall, 2020 to comply with the new Title IX regulations.[3]

60.    The hearing and appeal phases of John Doe's disciplinary matter were governed by Syracuse's revised policies.

61.    However, Syracuse continued to apply its updated policies with a gender bias against males, like Doe, accused of sexual misconduct, resulting in an erroneous finding of responsibility against Doe.

**B.      N.Y. Education Law Article 129-B**

62.    On July 7, 2015, the New York State Governor signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

63.    Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Syracuse.  *See* N.Y. Educ. Law § 6439(1).  It mandates that all such institutions, including Syracuse, adopt certain rules and procedures in connection with their sexual misconduct policies.

64.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.  Art. 129-B also requires the

---

[3] The date that the Syracuse University Student Conduct System Handbook 2020-2021 was published is not available online.

State to conduct random audits to ensure compliance with the provisions of the statute.

65.     Art. 129-B sets forth a standard of care with which colleges, including Syracuse, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

66.     In the instant case, Syracuse and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by Art. 129-B. As a result of this breach, Plaintiff suffered damages including loss of education, and loss of future educational and career opportunities.

67.     Art. 129-B mandates that all New York State institutions of higher education, including Syracuse, "shall ensure" that every student be afforded the following rights:

a.      The right "to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures;"

b.      The right "to an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest:"

c.      "The right to a process . . . that includes, at a minimum: (i) notice to a respondent describing the date, time, location and factual allegations concerning the violation, a reference to the specific code of conduct provisions alleged to have been violated, and possible sanctions"

d.      "[W]ritten notice of the findings of fact, the decision and the sanction, if any, as well as the rationale for the decision and sanction"; and

e.       "[A] written statement detailing the factual findings supporting the determination and the rationale for the sanction imposed."

*See* N.Y. Educ. L. § 6444.

68.     Defendants violated these rights, as guaranteed by Article 129-B, by: (i) failing to conduct a timely, thorough, and impartial investigation into Roe's claims against Plaintiff; and (ii) failing to meaningfully afford Plaintiff the presumption of innocence.

C.     **Syracuse's Sexual Misconduct Policy and Contract with John Doe**

69.     Upon Plaintiff's matriculation to Syracuse, Plaintiff and Syracuse became mutually bound by the 2021-2022 "Sexual Harassment, Abuse, and Assault Prevention Policy" (the "Policy") and the Procedures for Responding to Reports of Student Violations of the Sexual Harassment, Abuse, and Assault Prevention Policy (the "Procedures") (collectively the "Policies"), which are the applicable policies for Syracuse's Title IX procedures.

70.     Upon information and belief, the Policies are updated and/or revised each new school year.

71.     The Policies and/or the various provisions contained therein are available online through the Syracuse website.

72.     In response to local and federal pressure for failing to protect female accusers or taking a strong enough stance against sexual assault allegedly committed by males, Syracuse applied the Policies in a manner that, upon information and belief, resulted in harsher penalties for males accused of sexual misconduct as compared to females.[4]

73.     The Policy states that "[p]arties and their advisors will have the opportunity to view the evidence gathered, to view the investigation report, and to submit a written response to each."

74.     The University breached the Policy because Plaintiff was not given a meaningful opportunity to respond to the Investigation Report, as the requests in Plaintiff's response were

---

[4] Syracuse has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

nearly entirely ignored, while Roe's requests were catered to and added to the Investigation Report.

75.     The Policy states that students have the right to "participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

76.     The University breached the Policy because the Investigator conducted a biased investigation wherein Roe's witnesses were given more credibility, despite inconsistencies in their statements, in order to have Plaintiff found responsible.

77.     The Policy states that students have the right to "have disclosures of Dating or Domestic Violence, Stalking, Sexual Assault, and other forms of Sexual Harassment treated seriously."

78.     The University breached the Policy because Plaintiff was not afforded a fair opportunity, but rather was met with an investigation that was fraught with gender bias, wherein Plaintiff's complaint against Roe was treated with scrutiny, while Roe was allowed to explain away the inconsistencies in her complaint against Plaintiff.

79.     The Policy states that students have the right to "be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed or should have acted in a different manner to avoid such crimes or violations."

80.     The University breached the Policy because Plaintiff was probed and met with victim shaming when he was questioned about his complaint against Roe at the hearing, meanwhile Roe was not met with the same scrutiny.

81.     The Policy states that students have the right to "access at least one level of appeal of a determination."

82.     The University breached the Policy because Plaintiff was not given a meaningful opportunity to appeal, as the length of his appeal was limited to only ten pages and the procedural

grounds on which he could appeal were limited.

**D.**     **Plaintiff's Initial Interactions with Jane Roe; the Sexual Encounter in Question**

83.    At the time of the parties' sexual encounter, Jane Roe was a sophomore at Syracuse.

84.    Jane Roe was one of the leaders of the Delta pre-law fraternity (the "pre-law fraternity") at the University.

85.    In March of 2021, Plaintiff was in the process of pledging the pre-law fraternity and, during the pledging process, pledges were to reach out to eight older members of the pre-law fraternity to meet in order to establish a mentor-mentee relationship.

86.    Plaintiff obtained Roe's phone number through a pamphlet of mentors provided to the pre-law fraternity pledges.

87.    On March 15, 2021, Plaintiff texted Roe asking her to meet for coffee to see if they would pair up well for a mentee-mentor relationship.

88.    Plaintiff and Roe agreed to meet for coffee on Friday, March 19, 2021.

89.    Plaintiff and Roe then consistently text messaged with each other getting to know each other.

90.    Plaintiff and Roe discussed both going to "date night" at the Delta Kappa Epsilon ("DKE") house on Thursday, March 18, 2021.

91.    Plaintiff and Roe met briefly at a social gathering, although Roe did not remember because she was allegedly "blacked out."

92.    On March 19, 2021, Roe texted Plaintiff and asked if they could meet another day because she was hungover from the prior night.

93.    A few hours later, at 1:56 a.m. on March 20, 2021, Roe texted Plaintiff from a party at the DKE house, asking where Plaintiff was and if he had alcohol. Plaintiff and Roe briefly spent

time together at the party.

94.     Roe texted Plaintiff the following afternoon on March 20, 2021, asking Plaintiff to hang out on the University lawn with another one of her friends.

95.     When Plaintiff could not attend, Roe and Plaintiff planned to spend time together and explore their mentor-mentee connection at the party at the DKE house that night.

96.     Plaintiff texted Roe at 12:20 a.m. on March 21, 2021, asking Roe if she was at the DKE house yet. Plaintiff and Roe arranged meeting at the DKE house.

97.      When Roe arrived at the house a few minutes later, Plaintiff was sitting on a couch in the hallway of the house.

98.     Roe came over to Plaintiff, sat next to him on the couch, and they engaged in casual conversation.

99.     Roe and Plaintiff then mutually decided to go to one of the rooms upstairs to talk in a quieter setting.

100.    While in the room, Plaintiff and Roe sat on a couch and continued their conversation about the pre-law fraternity.

101.    Roe stated that she really wanted to be Plaintiff's mentor and began to place her hand on Plaintiff's leg and feel up his leg.

102.    A few minutes later, at approximately 1:20 a.m., J.M., J.D., J.A., and E.R. entered the room. The four had alcohol with them and took shots before leaving the room a few minutes later.

103.    Prior to leaving, at approximately 1:30 a.m., J.M. told Plaintiff Doe that Plaintiff should lock the door when they left. Upon information and belief, J.M. said this because he observed Roe being handsy with Plaintiff and believed that a sexual encounter may take place.

104.    At this point, Roe did not display any visible signs of incapacitation.

105.    Indeed, Roe's friend since high school, J.Y. saw Roe just minutes before Roe went upstairs with Plaintiff and did not express concerns about Roe's level of intoxication.

106.    Plaintiff took J.M.'s suggestion and locked the door upon the group's departure from the room. Once the door was locked, Plaintiff and Roe began to mutually kiss and undress each other.

107.    Once undressed, Roe voluntarily initiated oral sex on Plaintiff.

108.    Roe then took a photograph on Snapchat with Plaintiff without Plaintiff's consent and sent the photograph via Snapchat to J.Y. Roe was thus not incapacitated but rather was coherent enough to unlock her phone, capture a moment with a photograph, and disseminate that photograph.

109.    Roe then got on top of Plaintiff on the couch in a straddling position and asked Plaintiff if he had a condom. Plaintiff then retrieved a condom and put it on himself.

110.    Roe was menstruating at the time and coherent enough to remember and instruct Plaintiff to look away while she removed her tampon.

111.    Plaintiff and Roe engaged in sexual intercourse both in a missionary position on the bed in the room and with Roe on top of Plaintiff. Roe was awake, coherent, and a willing participant the entire time.

112.    Following sexual intercourse, Roe performed oral sex on Plaintiff for a second time.

113.    After the sexual encounter, Roe and Plaintiff dressed themselves. Plaintiff then informed Roe that he was going to the bathroom, and Roe voluntarily remained in the room waiting for Plaintiff.

114.    When Plaintiff returned, he informed Roe that he would be downstairs, and he left

the room at approximately 1:47 a.m.

115.     Plaintiff went to the basement of the house and texted Roe where he was and told her to let him know when she was downstairs.

116.     Later on in the night, one of the members of DKE told Plaintiff to come upstairs, and when he got upstairs Roe was still on the couch in the room.

117.     Plaintiff said that he would walk Roe home, and they walked back to Roe's dorm.

118.     After Plaintiff left, Roe texted Plaintiff apologizing and asking Plaintiff if he was okay.

119.     Roe then called Plaintiff apologizing and said that she really wanted to be Plaintiff's mentor still. Plaintiff said it was fine, hung up, and texted Roe that they could talk in the morning.

120.     The next day, Plaintiff and Roe spoke via Facetime, and Roe stated that she did not remember anything from the DKE house the night prior. Plaintiff explained their encounter and Roe stated that it was fine and that they did not need to make a big deal out of it. Roe also stated that she still wanted to be Plaintiff's mentor.

121.     Plaintiff subsequently texted his pledge master that Roe was going to be his mentor for the pre-law fraternity.

122.     Later in the day, however, Roe called Plaintiff and told Plaintiff that she was uncomfortable with what happened between them and that she wanted space.

123.     Plaintiff then informed his pledge master that something happened between him and Roe and that Roe would no longer be his mentor.

124.     That night, Plaintiff received a phone call from the President of the DKE fraternity saying that based upon what Roe had told him, Plaintiff was no longer welcome as a member of DKE.

125.     Plaintiff texted Roe explaining his confusion with the situation, especially given that he and Roe had just spoken about the encounter a few hours prior and Roe was not upset about it. However, Roe never responded.

126.     In the following days, Roe embarked on a smear campaign against Plaintiff, falsely informing other members of the fraternity that she had been violently attacked and raped by Plaintiff, that she had bruises, and that she went to the hospital.

127.     About one week later, on March 26, 2021, the Office of Student Rights and Responsibilities ("OSRR") issued mutual no contact orders to Plaintiff and Roe, after Roe reported the allegations to the DKE president. Upon information and belief, the DKE president reported the allegations to the OSRR.

128.     Following the no contact order, Roe's allegations continued to swirl, with Plaintiff hearing of Roe's allegations from more and more students on campus.

129.     In response, Plaintiff posted on his private Snapchat story[5] on April 12, 2021, to clear up the allegations without violating the no contact order. Plaintiff's story detailed the encounter while redacting names.

130.     Roe viewed the Snapchat story, took a photograph of it, and contacted the Department of Public Safety ("DPS"). Plaintiff was subsequently contacted by a DPS officer on the night of April 12, 2021, who reminded Plaintiff of the no contact order. The DPS officer confirmed that Plaintiff did not violate the no contact order.

131.     On April 22, 2021, OSRR sent Plaintiff a Notice of Investigation, identifying Roe's sexual assault allegations against him.

132.     After receiving the Notice of Investigation, Plaintiff Doe informed his mother of

---

[5] A private Snapchat story is a post that stays online for 24 hours and can only been seen by certain friends selected by the user.

the investigation. Plaintiff Doe detailed the encounter, including that Roe was his potential mentor, Doe did not flirt with Roe, and that Roe later came onto him sexually in a private setting. After speaking with his mother, Plaintiff recognized that Roe had sexually assaulted him, and used her platform as a mentor to pressure him into a sexual relationship when Plaintiff was only seeking out a professional relationship.

133.    Accordingly, Plaintiff filed a formal complaint with the University's Title IX office, stating that Roe had sexually assaulted him and that he had not given affirmative consent to the sexual encounter.

134.    The OSRR then issued a Notice of Investigation to Roe on May 10, 2021, detailing Plaintiff's sexual assault complaint against Roe.

135.    Bernerd L. Jacobson ("Jacobson"), the assigned Title IX Investigator in the matter, reached out to Plaintiff and Roe on May 14, 2021, to schedule interviews with them and their witnesses.

136.    Jacobson then conducted an interview with Plaintiff Doe on May 24, 2021, wherein Plaintiff explained the power dynamics between himself and Roe, and why he felt that he could not stop the encounter and Roe's advances. Plaintiff Doe maintained that he did not provide affirmative consent to the sexual encounter with Roe, and that he in no way sexually assaulted Roe. Rather, Roe was an active and willing participant.

137.    Moreover, Plaintiff Doe emphasized that Roe did not consume alcohol in front of him at the party on the night of the alleged incident, and that Roe exhibited no signs of intoxication.

138.    Jacobson then met with Roe on May 25, 2021. Roe, despite claiming that she "blacked out," had descriptive memory of the alleged incident with Plaintiff.

139.    Jacobson then reached out to and met with sixteen witnesses from the party and/or

DKE fraternity.

140.   Notably, a considerable number of Roe's witnesses provided unsupported testimony that was even disproven by video surveillance footage from the party.

141.   For example, Roe's friend, E.D., testified that when she saw Roe at the party, Roe was alone, extremely intoxicated, and that when E.D. greeted Roe, Roe simply stared at E.D. and walked away.

142.   Video footage showed, however, that when E.D. interacted with Roe, Roe was not alone but rather was with Plaintiff Doe. Moreover, Roe and E.D. mutually greeted and embraced each other at the party.

143.   In his interview, J.Y. stated that he heard generally that Roe was heavily under the influence on the night in question. However, when J.Y. was questioned specifically about his interactions with Roe, J.Y. stated that immediately prior to her entry at DKE house, Roe was not on the verge of blacking out, but was having a good time.

144.   Moreover, the four individuals that were in the room with Plaintiff and Roe on the night in question and thus observed Roe directly before the sexual encounter confirmed that Roe was not incapacitated. By way of example, and not limitation:

   a.   J.A. stated that Roe introduced herself to J.A. prior to entering the room and that they engaged in small talk. J.A. recalled that when he entered the room, Roe was on top of Plaintiff and that both Plaintiff and Roe looked completely sober. J.A. stated that he was shocked to learn of the allegations;

   b.   J.D. stated that as a female, she is cognizant of warning signs of incapacitation from other women, and stated that she saw no concerning signs when observing Roe and Plaintiff in the room;

   c.   E.R. stated that Roe was on Plaintiff's lap in the room, but that she did not see anything out of the ordinary. Roe and E.R. engaged in verbal introductions in the room wherein Roe asked E.R. the name of E.R.'s boyfriend;

d.     J.M. stated that Roe and Plaintiff looked extremely intimate in the room, and that Plaintiff and Roe did not look intoxicated. J.M. instructed Plaintiff to lock the door when he left and stated that if he felt that either Plaintiff or Roe was too intoxicated, he would not have instructed Plaintiff to do so.

145.    On June 24, 2021, Jacobson emailed Plaintiff and Roe informing them that they had been given access to the investigative file, including evidence and witness interviews, and that they had until July 11, 2021, to submit a response to the file.

146.    Plaintiff Doe responded on July 10 and July 11, 2021, requesting that Roe be questioned about any substances that she had taken on the day of the alleged incident that may have affected her memory, because one of the witnesses stated that Roe may have taken medication prior to the encounter.

147.    Jacobson then met with Plaintiff and Roe for follow-up interviews on July 28, 2021.

148.    Notably, Jacobson failed to inquire as to Roe's medications, but asked Plaintiff almost all of Roe's follow up questions.

149.    On September 16, 2021, Jacobson issued the Investigative Report.

150.    The Investigative Report was fraught with inconsistencies and errors and was clearly fashioned in a manner to have Plaintiff found responsible.

151.    On September 19, 2021, Plaintiff emailed Jacobson a response to the Investigative Report, noting that the Report did not contain the witness observation of Plaintiff and Roe's relative intoxication when Plaintiff and Roe were in the upstairs room, including that both Plaintiff and Roe appeared "dead sober," and requested that the observations be included from the four individuals that were in the room just prior to sexual activity.

152.    Notably, however, Jacobson failed to add this information to the Investigative report.

153.    A live hearing was held on the matter on October 26-28, 2021.

154.    At the hearing, while the Hearing Officer, Sheriah Dixon, heard testimony relating to both Plaintiff's claims against Roe and Roe's claims against Plaintiff, Plaintiff was discriminated against on the basis of his gender and treated differently than Roe due to his male status.

155.    While Plaintiff and Roe were both complainants and respondents, Plaintiff was grilled with questions relating to his claims, amounting to unveiled victim blaming. For example, Plaintiff was asked if he resisted, said no, or otherwise tried to stop the sexual contact. When Plaintiff answered in the negative, the Hearing Officer drew conclusions that Plaintiff was not sexually assaulted.

156.    Further, the Hearing Officer allowed Roe's advisor to inappropriately question Plaintiff as to whether it would have been "possible" for Plaintiff to escape Roe's advances, as well as whether Plaintiff's body responded to Roe's advances by becoming erect.

157.    Roe, on the other hand, as the female complainant, was met with only clipped questioning that was, on information and belief, meant not to "retraumatize" Roe, and allowed her to explain away the inconsistencies in her story and the stories of her witnesses as a result of alleged trauma. Further, Roe was not questioned as to her ability to "escape" or how her "body responded" to the sexual encounter.

158.    After the hearing, the Hearing Officer issued her Decision Letter on November 29, 2021.

159.    The Decision Letter, in an even more egregious manner than the hearing, dismissed any inconsistencies or weaknesses in Roe's testimony and emphasized facts detrimental to Plaintiff's testimony in order to find Plaintiff responsible for touching Roe's breasts without consent.

160.    By way of example, and not limitation, while the Investigator, through prolonged and thorough review of the video surveillance, created a timeline of events in the Investigative Report with specificity, the Decision Letter, for the first time, claimed that the timeline was only *estimated* and that testimony of other students, all of whom either did not attend the hearing or admitted to a weakness in recollection as to the events, called the Investigator's timeline into question. However, none of the parties challenged the created timeline.

161.    Indeed, in the "findings of fact" section of the Decision Letter, the Hearing Officer claimed that Roe was found unconscious in the upstairs bedroom *sometime between 2:00 a.m. and 2:41 a.m.*, meanwhile the Investigator's timeline makes clear that the other students did not enter the upstairs bedroom until 2:41 a.m., meaning that Roe had been alone upstairs for at least 54 minutes after the sexual encounter.

162.    The Hearing Officer's Decision Letter, however, improperly suggests that Plaintiff and Roe may have had a sexual encounter merely 13 minutes before Roe was found sleeping upstairs rather than approximately one hour earlier, and thus called into question Roe's ability to consent to sexual contact during her first 32 minutes inside the DKE house.

163.    The failure of the Hearing Officer to make a factual determination as to a critical timeframe and the careless act of giving credibility to disproven approximations by non-testifying and/or under-the-influence witnesses improperly impacted the outcome of the hearing.

164.    Moreover, the Hearing Officer incredibly discredited the testimony of the four impartial students that were in the room with Plaintiff and Roe *immediately prior* to the sexual encounter, where each student unequivocally stated that Roe did not appear intoxicated, by finding that the students came into the room for their own reasons and did not appear to have an interest in observing Roe's behavior.

27

165.    Worse, while seeking to limit the accounts of the four students that were physically present in the room with Plaintiff and Roe, the Decision Letter highlighted the unlikely and inaccurately stated accounts of E.D. and J.Y., two witnesses that did not testify at the hearing.

166.    The Investigative Report was fashioned in a way to have Plaintiff found responsible. For example, the Report improperly claimed that J.Y. stated that Roe was "heavily under the influence" and "not ok" when he saw her prior to her entry of the DKE house. However, J.Y. made these statements in his interview while providing a non-specific overview of what he heard, knew, or saw about the entirety of the night in question. However, when specifically questioned about his personal observation of Roe immediately prior to her entry of the DKE house, J.Y. stated that Roe was "not on the verge of blacking out" and "having a good time." The Decision Letter, however, fails to note that these statements were said by J.Y.

167.    Upon information and belief, the Investigator cherry-picked witness statements to paint Roe as incapacitated and Plaintiff as responsible, while burying or ignoring any evidence or statements that could negatively affect Roe's credibility.

168.    The Decision Letter additionally focused on Roe's reported behavior *before* arriving at the DKE house and at least one hour *after* the sexual encounter. The Decision Letter provided no indication that Roe was unable to consent *at the time of the sexual encounter* and moreover, that Plaintiff *knew* or should have known that Roe was unable to consent at the time of the sexual encounter, as required by the University's policies.

169.    The Decision Letter also highlighted two instances of video footage where Roe at one point appears to steady herself, while the Letter ignored substantial video footage of Roe carrying herself without issue and walking with purpose.

170.    The Decision Letter further sanctioned Plaintiff to expulsion from the University.

171.    Plaintiff timely appealed the Decision and Sanction on December 20, 2021. However, University policies limited Plaintiff's appeal to ten pages, severely limiting the scope of the appeal to only five grounds.

172.    Accordingly, Plaintiff did not have a proper opportunity to challenge all procedural inadequacies on appeal.

173.    Plaintiff's appeal was denied by Joshua D. Rich, Associate Director of the Office of Community Standards, on February 18, 2022.

174.    Plaintiff has exhausted all available avenues for appeal under the University's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

**E.      Plaintiff's Damages**

175.    As a direct and proximate result of Defendant's biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in nonconsensual sexual intercourse has been made a part of Plaintiff's educational records and a notation has been made on his records and transcript. These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to a graduate school or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

176.    By improperly suspending and then expelling Plaintiff and placing a notation on his transcript, Syracuse has damaged Plaintiff's future education and career prospects. Specifically, as a result of the University's actions, Plaintiff will be forced to disclose and explain to potential employers and any school to which he may opt to apply that he was disciplined by Syracuse for sexual misconduct.

177.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

178.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

179.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

180.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

181.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

**F.     Climate Concerning Sexual Assault at Syracuse**

182.     As discussed, schools like Syracuse enacted victim-centered policies and procedures for resolution of sexual assault complaints.

183.     In doing so, these schools were guided by the now-rescinded April, 2011 Dear Colleague Letter, the threat of OCR investigations, Title IX lawsuits and the ultimate penalty-- rescission of federal funds.

184.     In recent years, and during the pendency of Doe's disciplinary proceeding, Syracuse has faced significant pressure to make findings of responsibility against males accused of sexual assault due to investigations of OCR complaints.

185.    Upon information and belief, during the pendency of Doe's disciplinary proceeding, there was one open OCR investigation, commenced in June 2016, dealing with mishandling of a Title IX complaint. Lena Groger and Annie Waldman, *Has Your School Been Investigated for Civil Rights Violations?,* PROPUBLICA (June 21, 2018) https://projects.propublica.org/graphics/civil-rights-violations#1074.

186.    Syracuse's administration has come under pressure from the media and its student body for the way it has handled sexual assault, and in particular sexual assault against females.

187.    Upon information and belief, Syracuse was motivated to favor Roe, as the female accuser, instead of Doe, the male respondent because it did not want further criticism that it failed to protect female students from assault or to take the complaints of female students seriously.

188.    On May 30, 2014, Syracuse Chancellor Kent Syverud sent a memo to students explaining that the Advocacy Center for Sexual Assault Victims would be shut down and directing all sexual assault related complaints and concerns to the Syracuse Counseling Center.

189.    According to Erin Carhart, a Syracuse graduate who was quoted by *Buzzfeed News*, students saw the removal of the Advocacy Center as "problematic" because "placing sexual assault services under an umbrella of mental health services really doesn't do the work justice." Krystie Lee Yandoli, *Syracuse University To Close Advocacy Center For Sexual Assault Victims*, BUZZFEED (June 2, 2014), https://www.buzzfeed.com/krystieyandoli/syracuse-university-to-close-advocacy-center-for-sexual-assa?utm_term=.oeEdxV8V5#.fwnYWg8go.

190.    Upon information and belief, Syracuse's policy change detracted from the importance of sexual assault prevention and advocacy.

191.    In February 2016, after the May 2014 removal of the Advocacy Center, Syracuse was the first private university to back the Campus Accountability and Safety Act. THE CHRONICLE

OF           HIGHER           EDUCATION,           Syracuse           University
http://projects.chronicle.com/titleix/campus/Syracuse-University/ (last visited June 3, 2022).

192.   This bill puts more pressure on colleges to respond to reported sexual violence, requires colleges to make annual, anonymous surveys about sexual violence on campus, and forces the federal government to improve its disclosure of investigations into colleges accused of mishandling sexual violence. Mark Weiner, *Gillibrand: Syracuse University is first large private school to back sexual assault bill*, SYRACUSE.COM (Feb. 17, 2016, 7:69 p.m.) https://www.syracuse.com/politics/2016/02/gillibrand_syracuse_university_is_first_large_privat e_school_to_back_sexual_assa.html.

193.   Upon information and belief, Syracuse sought to correct its track record of mishandling sexual violence against women and to create an image that it was "tough" on sexual violence through its early backing of the Campus Accountability and Safety Act.

194.   In 2020, Syracuse sent around a survey to 4,000 students anonymously; the results of which details how 19% of students experienced nonconsensual sexual contact during their time at school. Syracuse University's Chancellor's Task Force on Sexual and Relationship Violence, *Survey on Sexual and Relationship Violence, 2020 Findings*, SYRACUSE UNIVERSITY https://psdocs.syr.edu/sudocs/misc/climateassessment2020.pdf. The survey was sent to a random sample of students, 1,160 of whom participated in the survey. 24% of those who responded to the survey said they had experienced dating violence and 17% said they had been sexually harassed while a student at Syracuse. Kailey Norusis, *19% of students sexually assaulted while at SU, survey says,* THE DAILY ORANGE (Dec. 3, 2020, 5:25 p.m.) https://dailyorange.com/2020/12/19-students-sexually-assaulted-syracuse-university-survey-says/; *see also* Rebecca Lan, et. al., *Survivors Turn from Title IX Reporting*, THE NEWSHOUSE.COM, (May 3, 2022)

https://www.thenewshouse.com/equality/survivors-turn-from-title-ix-reporting/.

195.    The same survey that was done in 2020 was also done in 2018. 23% of respondents replied that they had experienced nonconsensual sexual contact since starting school at Syracuse. Of those respondents, 95% of students did not feel comfortable or had not come forward to report their sexual assault. Casey Darnell, *SU releases results of survey on sexual assault, harassment*, THE DAILY ORANGE (Apr. 30, 2019, 8:24 p.m.) https://dailyorange.com/2019/04/su-releases-results-survey-sexual-assault-harassment/.

196.    Upon information and belief, Syracuse sought to over-correct for its prior mishandling of sexual assault matters, by depriving accused males, like Doe, of an impartial disciplinary proceeding.

197.    As discussed, Syracuse updated its Title IX policies to allow for live cross-examination of complainants and witnesses. The updated policy ensured that sexual harassment complaints were heard in a live hearing where each party had the option to have an advisor cross-examine the other party.

198.    Syracuse faced criticism from those who feared that the new policies would reduce the number of people who reported sexual violence due to fear of cross-examination. Michael Sessa, *SU updates Title IX sexual assault policies, opposes new regulations,* THE DAILY ORANGE (Aug. 18, 2020, 5:29 p.m.) https://dailyorange.com/2020/08/syracuse-university-updates-title-ix-sexual-assault-policies-opposes-new-regulations/.

199.    Two lawsuits filed separately in February 2020 claim Syracuse "knowingly and willingly" failed to conduct a proper investigation into "credible" claims that Conrad Mainwaring, an Olympic athlete and Syracuse alumnus, was abusing "young boys" in his dorm when he was a Resident Advisor. Syracuse tried to dismiss the lawsuits, claiming that they had no knowledge of

the abuse allegations until February of 2019, 38 years since the abuse occurred in 1981/82.

200.    Mainwaring met with his victims in a dorm room under the ruse of "physiotherapy", "physical therapy" and "mental training sessions." Michael Sessa, *Judge denies SU's motions to dismiss sexual abuse lawsuits,* THE DAILY ORANGE (Apr. 11, 2021, 9:04 p.m.) https://dailyorange.com/2021/04/judge-dismiss-sexual-abuse-lawsuit/.

201.    Upon information and belief, Syracuse is under pressure to avoid negative publicity and campus unrest concerning its handling of female sexual misconduct complaints against males.

202.    Syracuse's Health Promotions Department has put together a Clothesline Project, part of Take Back the Night, for the last 10 years. The Clothesline Project is a way to bring attention to victims of sexual violence who may not feel comfortable coming forward and sharing their stories. Maggie Hicks, *Clothesline Project becomes stepping stone for sexual assault survivors*, THE DAILY ORANGE (Apr. 4, 2021, 9:27 p.m.) https://dailyorange.com/2021/04/clothesline-project-barnes-center-shirts-syracuse-university/.

203.    In a report on data from the first five months of 2018, Syracuse ranked #12 out of 50 New York colleges with the most sexual assaults reported. There were a total of 30 incidents reported, which rounded out to be about 1.04 students out of every 1,000 students. There were 12 assaults that occurred on campus and 6 of them were reported to law enforcement. Ben Axelson, *50 New York colleges with the most sexual assault reports, ranked,* NYUP.COM (Oct. 25, 2018, 5:59 a.m.) https://www.newyorkupstate.com/news/erry-2018/10/b70d7bd6361854/50-new-york-colleges-with-the.html.

204.    Upon information and belief, Syracuse has repeatedly been under fire for the number of sexual assaults on their campus and deprived Doe of procedural protections and operated with a gender bias against Doe in order to appear "tough" on sexual assault.

205.    In an op-ed for "The Daily Orange" a school newspaper at Syracuse, Ava Notkin, a senior, detailed her experience with rape culture at the school.  She referenced how rape culture was "just Greek culture" and "just party culture."  She further elaborated that the "glossed over rape culture" at Syracuse is a "toxic sickness." Ava Notkin, *Stop normalizing rape culture on college campuses*, THE DAILY ORANGE   (Mar.   21,   2021,   9:39   p.m.) https://dailyorange.com/2021/03/stop-rape-culture-college-campuses/.

206.    Upon information and belief, Syracuse's leadership exerted pressure, ideological and otherwise, to find against males accused of sexual misconduct and to deprive them of due process.

207.    Upon information and belief, Syracuse was responding to pressure from the University's leadership and from local and student media when they rushed to find Doe responsible against the overwhelming weight of the evidence.

208.    Upon information and belief, it was in part because of the fear of another OCR investigation, and because of the bad publicity surrounding the University, that the University sided with Roe over Doe in what amounted to a simple credibility contest.

209.    Plainly, the University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus.

210.    Upon information and belief, Defendant Syracuse has repeatedly conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct.

## AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**(Erroneous Outcome)**

211.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

212.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

213.    Upon information and belief, Syracuse, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

214.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Syracuse.

215.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

216.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

217.    The Second Circuit has observed several categories to challenge university disciplinary proceedings for sex discrimination, including: (1) "erroneous outcome" cases, in which the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective

enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

218.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

219.    In *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019), the Second Circuit addressed "irregularities" that pointed gender bias:

> [W]e need not define precisely what sort of irregularities meet the standard of "clearly irregular investigative or adjudicative process." But we note that *Doe v. Columbia* [831 F.3d 46, 57 (2d Cir. 2016),] offers some guidance on this issue. For instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias."

*Menaker v. Hofstra*, 935 F.3d at 34.

220.    Syracuse violated Title IX in the instant case because the University reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

221.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above; they include, but are not limited to, the following:

a.    Syracuse ignored exculpatory evidence demonstrating that Roe gave full affirmative consent to the sexual encounter, including the testimony of the students that were in the room with Plaintiff and Roe immediately prior to the sexual activity and testified that Roe did not appear incapacitated;

b.    The Hearing Officer's decision relied heavily on the testimony of Roe's witnesses that were either not present at the hearing or whose testimony had

been contradicted by clear video evidence;

c.   As noted above, the Hearing Officer and Investigator each ignored numerous inconsistencies in Roe's narrative in order to find her credible. By contrast, Plaintiff's words were twisted and taken out of context in order to support a finding that he was not credible;

d.   The Hearing Officer's decision is not supported by a preponderance of the evidence; and

e.   Syracuse failed to adequately and genuinely consider Plaintiff's appeal, and severely limited Plaintiff's appeal opportunity by limiting his appeal to ten pages.

222.   There was a particularized causal connection between the erroneous outcome in his case and gender bias. Facts sufficient to plead the existence of this bias and its connection to the erroneous outcome have already been alleged in the Complaint in detail and include, without limitation, the following:

a.   The federal pressure placed on Syracuse by virtue of OCR investigations, which put Syracuse at risk for losing federal funding, and one of which was, on information and belief, still pending during the pendency of Doe's disciplinary proceeding;

b.   Years of pressure and criticism from the student body specifically geared towards Syracuse's perceived failure to protect females from sexual misconduct;

c.   Upon information and belief, Syracuse's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise;

d.   Even though both Plaintiff Doe and Roe were both complainants and respondents, Plaintiff was grilled with questions related to his claims, while Roe was met with only clipped questioning that was, upon information and belief, meant not to "retraumatize" Roe, and allowed her to explain away the inconsistencies in her story and the stories of her witnesses as a result of alleged trauma. Further, Roe was not questioned as to her ability to "escape" or how her "body responded" to the sexual encounter;

e.   Investigator Jacobson conducted a gender-biased investigation, finding Roe credible despite serious inconsistencies in her narrative, as detailed above;

and

    f.    As detailed above, the Hearing Officer ignored numerous inconsistencies in Roe's narrative in order to find her credible. By contrast, Doe's words were twisted and taken out of context at the hearing to support a finding that he was not credible. The disparate treatment of Roe and Doe is indicative of gender bias against Doe.

223.    Upon information and belief, Syracuse's mishandling of Plaintiff's Title IX case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

224.    Syracuse applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

225.    Syracuse also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

226.    As discussed above, the public pressure on Syracuse to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff John Doe to a biased and unfair process, which was tilted in favor of the female and against him, the male.

227.    A university that is motivated to take adverse action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d at 58 (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

228.   Upon information and belief, Syracuse has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

229.   Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

230.   This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

231.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Syracuse to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**(Selective Enforcement)**

232.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

233.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

234.     Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Syracuse University.

235.     As noted above, in "selective enforcement" cases, a Plaintiff can challenge a university disciplinary outcome by asserting that regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

236.     For a selective enforcement claim, a male plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University…" and that the "University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Xiaolu Peter Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015).

237.     In the instant matter, the University subjected John Doe to disparate treatment in comparison to Jane Roe—a similarly situated female—and imposed a more severe sanction upon him.

238.     Syracuse consolidated Doe's claims against Roe and Roe's claims against Doe into one investigation because they stemmed from the same alleged incidents.

239.     Roe and Doe were similarly situated because they were both complainants and respondents.

240.    At the end of the investigation and hearing, Syracuse found Doe responsible for the allegations set forth by Roe against him and expelled him. Conversely, Syracuse did not find Roe responsible for any violations whatsoever and did not impose any sanctions upon her.

241.    There are numerous circumstances demonstrating the University's partiality towards Roe as the female accuser, and against Doe as the male accused. These circumstances include, *inter alia*:

    a.    Despite a clear narrative set forth by John Doe, the University found Jane Roe not responsible for any violations whatsoever and did not impose any sanctions upon her, yet found Doe responsible and expelled him from Syracuse.

    b.    Years of pressure and criticism from the student body specifically geared towards Syracuse's perceived failure to protect females from sexual misconduct;

    c.    Upon information and belief, Syracuse's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise;

    d.    Even though both Plaintiff Doe and Roe were both complainants and respondents, Plaintiff was grilled with questions related to his claims during the hearing, while Roe was met with only clipped questioning that was, upon information and belief, meant not to "retraumatize" Roe, and allowed her to explain away the inconsistencies in her story and the stories of her witnesses as a result of alleged trauma. Further, Roe was not questioned as to her ability to "escape" or how her "body responded" to the sexual encounter, while Doe was;

    e.    The federal pressure placed on Syracuse by virtue of OCR investigations which put Syracuse at risk for losing federal funding, and one of which was, on information and belief, still pending during the pendency of Doe's disciplinary proceeding;

    f.    Investigator Jacobson conducted a gender-biased investigation, finding Roe credible despite serious inconsistencies in her narrative, as detailed above; and

    g.    The Hearing Officer ignored numerous inconsistencies in Roe's narrative in order to find her credible. By contrast, Doe's words were twisted and

taken out of context at the hearing to support a finding that he was not credible. The disparate treatment of Roe and Doe is indicative of gender bias against Doe.

242.    Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and punish him severely for it.

243.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

244.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Syracuse to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

245.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

246.    At all times relevant hereto, a contractual relationship existed between Syracuse and Plaintiff by virtue of Plaintiff's enrollment at Syracuse and as defined by and through Syracuse's policies and procedures governing the student disciplinary system, including but not

limited to the 2019 Title IX Policy and the 2020 Title IX Policy.

247.    Through the documents it publishes and provides to students, Syracuse makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the 2019 Title IX Policy and the 2020 Title IX Policy.

248.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015).

249.    Implied in every contract is the covenant of good faith and fair dealing. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

250.    Based on the aforementioned facts and circumstances, Syracuse created express and implied contracts when it offered, and Plaintiff accepted, admission to Syracuse, and when Plaintiff paid the required tuition and fees.

251.    As detailed above, Syracuse breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint.  By way of example, and not limitation:

   a. Failing to provide Plaintiff with a fair and impartial investigation;

   b. Failing to provide Plaintiff with a meaningful opportunity to respond to the Investigation Report;

   c. Failing to treat Plaintiff's report against Roe equally to Roe's report against Plaintiff, and instead treating Plaintiff as the perpetrator;

   d. Failing to allow Plaintiff to be free from suggestion that he was at fault for his complaint against Roe, and probing him with victim-shaming questions at the hearing; and

e. Failing to provide Plaintiff with an adequate opportunity to appeal the decision.

252. Syracuse further breached the implied covenant of good faith and fair dealing, by applying its policies in a discriminatory manner.

253. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

254. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Violation of New York State Human Rights Law**

255. Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

256. Defendant Syracuse is an educational corporation and operating as such under the laws of the State of New York.

257. The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

258. Syracuse's policy on Sexual Harassment, Abuse, and Assault Prevention states, in pertinent part:

> "[t]he purpose of this policy is to prevent and redress Sexual Harassment and related forms of prohibited conduct at Syracuse University by: setting community expectations regarding discrimination and harassment; describing what conduct is prohibited; and explaining how the University

will respond to reports of prohibited conduct. It is also meant to ensure compliance with Title IX of the Education Amendments of 1972 ("Title IX"), its implementing regulations, and other applicable sexual harassment prevention laws."

259.    Syracuse's policy on Sexual Harassment, Abuse, and Assault Prevention also states that it prohibits, "[s]exual Harassment as defined in the Title IX regulations…which includes Sexual Assault, Dating Violence, Domestic Violence, and Stalking…and other forms of Sexual Harassment, including as defined in Title VII of the Civil Rights Act of 1964 . . ."

260.    Based on the foregoing, Syracuse permitted discrimination against John Doe on the basis of his sex.

261.    Based on the foregoing, Syracuse authorized, condoned, and/or acquiesced to discriminatory conduct against John Doe.

262.    Based on the foregoing, Syracuse knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

263.    Defendant Syracuse engaged in the following discriminatory acts or practices against John Doe, as the male accused: Syracuse subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender, Syracuse failed to adhere to its Handbook; the Decision was discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the Decision was a discriminatory bias against males.

264.    Based on the foregoing facts and circumstances, Syracuse engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4).

265.    As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

266.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant Syracuse University as follows:

(i)     On the first cause of action for violation of Title IX of the Education Amendments of 1972 (erroneous outcome), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Syracuse to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for violation of Title IX of the Education Amendments of 1972 (selective enforcement), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Syracuse to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)   On the third cause for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    On the fourth cause of action for New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(v)   Equitable and injunctive relief directing Syracuse to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante; and

(vi)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         June 15, 2022

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

By: /s/ *Andrew T. Miltenberg*

Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Tara J. Davis, Esq.
Nicholas E. Lewis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com
nlewis@nmllplaw.com