**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN DOE,**

            **Plaintiff,**

     **v.**                              **No. 5:22-cv-644**
                                               **(TJM/TWD)**

**SYRACUSE UNIVERSITY,**

            **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

Before the Court is Defendant Syracuse University's motion to dismiss the Complaint.  See dkt. # 20.  The parties have briefed the issues, and the Court will decide the matter without oral argument.

**I.    Background**

This case involves Plaintiff John Doe's claims that Defendant Syracuse discriminated against him on the basis of his gender and breached a contract between the parties after Defendant expelled Plaintiff.  Plaintiff's expulsion from the University came after the University's investigation of allegations by Jane Roe,[1] a fellow student, that Plaintiff sexually assaulted her.  Plaintiff's Complaint raises five counts: a claim that the University erred in concluding that he had assaulted Roe ("erroneous outcome" claim) in violation of Title IX of

_____

[1]"John Doe" and "Jane Roe" are pseudonyms.

1

the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et seq.; a claim that the University applied its sexual misconduct in a way that discriminated against men like him ("selective enforcement" claim) in violation of Title IX; a claim that this conduct violated the New York Human Rights Law ("NYHRL"); and a breach-of-conduct claim under New York law.  Defendant contends that Plaintiff has not plausibly alleged defects in the outcome or selective enforcement and that he has not pointed to any breach of contract.  Defendant seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff opposes the motion, asserting that his allegations are sufficient to state a claim.

## II.    LEGAL STANDARD

Defendant has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants argue that Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true.  In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.   Analysis

Defendant moves to dismiss each claim asserted in the Complaint.  The Court will

address each in turn.

### i. Title IX–Erroneous Outcome

Plaintiff's first a cause of action alleges gender-based discrimination in violation of Title IX of the Education Amendments Act of 1972.  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." Columbia Univ., 831 F.3d at 53.  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  Id. (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories."  Yusuf, 35 F.3d at 715.  In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." Id.  In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Id.  Under either theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory." Yusuf, 35 F.3d at 715.  Thus, in order to establish a claim of discrimination under Title IX, Plaintiff must ultimately show that the defendant discriminated against him because of sex,

that the discrimination was intentional, and that the discrimination was a "substantial" or

"motivating factor" for the defendant's actions.  Prasad v. Cornell Univ., No. 5:15-CV-322,

2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016)(internal quotation marks and citation

omitted).

Defendant first argues that Plaintiff has not plausibly alleged an erroneous outcome

claim.  A plaintiff who brings an erroneous outcome Title IX claim "must allege particular

facts sufficient to cast some articulable doubt on the accuracy of the outcome of the

disciplinary proceeding."  Yusuf, 35 F.3d at 715.  "If no such doubt exists based on the

record before the disciplinary tribunal, the claim must fail." Id.  Congress did not intend "Title

IX to impair the independence of universities in disciplining students against whom the

evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective

enforcement."  Id.

> However, the pleading burden in this regard is not heavy.  For example, a
> complaint may allege particular evidentiary weaknesses behind the finding of
> an offense such as a motive to lie on the part of a complainant or witnesses,
> particularized strengths of the defense, or other reason to doubt the veracity of
> the charge. A complaint may also allege particular procedural flaws affecting
> the proof.  However, allegations of a procedurally or otherwise flawed
> proceeding that has led to an adverse and erroneous outcome combined with
> a conclusory allegation of gender discrimination is not sufficient to survive a
> motion to dismiss. The fatal gap is, again, the lack of a particularized
> allegation relating to a causal connection between the flawed outcome and
> gender bias.  A plaintiff must thus also allege particular circumstances
> suggesting that gender bias was a motivating factor behind the erroneous
> finding.  Allegations of a causal connection in the case of university
> disciplinary cases can be of the kind that are found in the familiar setting of
> Title VII cases.  Such allegations might include, *inter alia*, statements by
> members of the disciplinary tribunal, statements by pertinent university
> officials, or patterns of decision-making that also tend to show the influence of
> gender.  Of course, some allegations, such as statements reflecting bias by
> members of the tribunal, may suffice both to cast doubt on the accuracy of the
> disciplinary adjudication and to relate the error to gender bias.

Id. (citations omitted); see Columbia Univ., 831 F.3d at 55–56 ("[A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.").  "[T]he inference of discriminatory intent supported by the pleaded facts [need not] be the most plausible explanation of the defendant's conduct.  It is sufficient [at the Rule 12(b)(6) stage] if the inference of discriminatory intent is plausible." Columbia Univ., 831 F.3d at 57.

Plaintiff alleges that he met Jane Roe when she was a second-year student at Syracuse University.  Complaint ("Complt."), dkt. # 1, at ¶ 83.  At the time, Roe was a leader in a pre-law fraternity at Syracuse.  Id. at ¶ 84.  Plaintiff "was in the process of pledging" that fraternity.  Id. at ¶ 85.  As part of that process, Plaintiff alleges, "pledges were to reach out to eight older members of the pre-law fraternity to meet . . . to establish a mentor-mentee relationship."  Id.  Plaintiff obtained Roe's name and texted her on March 15, 2021, "asking her to meet for coffee to see if they would pair up well" for a mentoring relationship.  Id. at ¶¶ 86-87.  The two set up a meeting over coffee on March 19, 2021.  ¶ 89.  Plaintiff further alleges that the two "consistently text messaged with each other getting to know each other."  Id. at ¶ 89.  Roe and Plaintiff "discussed" meeting at a "'date night'" at a fraternity house on campus on March 18, 2021.  Id. at ¶ 90.  Plaintiff further alleges that he and Roe "met briefly at a social gathering, although Roe did not remember because she was allegedly 'blacked out.'"  Id. at ¶ 91.  On March 19, 2021, Roe contacted Plaintiff to request they reschedule their meeting, as "she was hungover from the prior night."  Id. at ¶ 92.

At 1:56 a.m. on March 20, 2021, Roe texted Plaintiff from a party at the Delta Kappa

Epsilon fraternity house.  Id. at ¶ 93.  Roe wanted to know where Plaintiff was, and whether he had any alcohol.  Id.  The two eventually spent a brief time together at the fraternity party that night.  Id.  Later that day, Roe texted Plaintiff, asking him "to hang out on the University lawn with another one of her friends."  Id. at ¶ 94.[2]  Plaintiff was not available, but "Roe and Plaintiff planned to spend time together and explore their mentor-mentee connection at" another party at the fraternity house that night.  Id. at ¶ 95.

Plaintiff texted Roe at 12:20 a.m. on March 21, 2021 to find out if she had arrived at the fraternity house.  Id. at ¶ 96.  The two arranged to meet at the house.  Id.  Plaintiff was sitting on a couch in the hallway of the house when Roe arrived a few minutes later.  Id. at ¶ 97.  Roe allegedly approached Plaintiff and sat next to him on the couch.  Id. at ¶ 98.  The two had a casual conversation.  Id.  They "mutually decided to go to one of the rooms upstairs" and have a talk "in a quieter setting."  Id. at ¶ 99.

In that upstairs room, Roe and Doe sat on a couch and continued to talk about the pre-law fraternity.  Id. at ¶ 100.  According to Plaintiff, Roe told him that "she really wanted to be" his "mentor[.]" Id. at ¶ 101.  She "began to place her hand on Plaintiff's leg and feel up his leg."  Id.

At approximately 1:20 a.m., three students, J.M., J.D., and E.R., entered the room. Id. at ¶ 102.  They had alcohol, and "took shots before leaving the room a few minutes later."  Id.  J.M. told Plaintiff that he "should lock the door when" the four students left the room.  Id. at ¶ 103.  Plaintiff alleges that J.M. made this statement "because he observed Roe being handsy with Plaintiff and believed that a sexual encounter may take place."  Id.

_____

[2]Plaintiff's phrasing does not make clear whether Roe planned to join her friend on the lawn.

Plaintiff alleges that "[a]t this point, Roe did not display any signs of incapacitation." Id. at ¶ 104.  One of Roe's high school friends, J.Y., saw Roe "just minutes before Roe went upstairs with Plaintiff[.]" Id. at ¶ 105.  J.Y. allegedly "did not express concerns about Roe's level of intoxication."  Id.

Taking J.M.'s advice, Plaintiff locked the door to the room when the four students who came in to have a shot left.  Id. at ¶ 106.  The two had a sexual encounter.  Id. at ¶¶ 106-112.  Plaintiff alleges that Roe "initiated oral sex" on him, and took pictures on Snapchat without Plaintiff's consent.  Id. at ¶ 108.  Roe allegedly sent these pictures to J.Y. Id. at ¶ 108.  She also allegedly asked Plaintiff if he had a condom and asked that Plaintiff look away while she removed her tampon.  Id. at ¶¶ 109-111.  Plaintiff alleges that "Roe was awake, coherent, and a willing participant" in the entire sexual encounter.  Id. at ¶ 111.

When the sexual encounter ended, Plaintiff and Roe "dressed themselves."  Id. at ¶ 113.  Plaintiff told Roe that he was going to go to the bathroom.  Id.  Roe remained in the room, "waiting for Plaintiff."  Id.  Plaintiff returned to the room where Roe had remained, told her he "would be downstairs," and left the room at approximately 1:47 a.m.  Id. at ¶ 114. Plaintiff went to the basement of the fraternity house.  Id.  at ¶ 115.  Plaintiff texted Roe to tell her where he was.  Id.  He told her to let him know when she was downstairs.  Id.

Later that night, a fraternity member told Plaintiff he needed to go upstairs.  Id. at ¶ 116.  Plaintiff found Roe on the couch in the room where he had left her.  Id.  Plaintiff alleges that he told Roe he would walk her home.  Id. at ¶ 117.  He claims that he walked Roe back to her dorm.  Id.  When Plaintiff left, Roe allegedly texted him to ask "if he was okay."  Id. at ¶ 118.  According to Plaintiff, "Roe then called Plaintiff apologizing[.]" Id. at ¶ 119.  Plaintiff alleges that Roe told him she still wanted to be his mentor.  Id. Plaintiff claims

he told Roe "it was fine, hung up, and texted Roe that they could talk in the morning." Id.

Roe and Plaintiff spoke the next day via Facetime. Id. at ¶ 120. Roe allegedly stated that she could not remember anything that occurred in the fraternity house the prior night. Id. Plaintiff alleges that he "explained their encounter." Id. Roe purportedly "stated that it was fine and they did not need to make a big deal out of it." Id. Plaintiff further alleges that Roe stated she "still wanted to be Plaintiff's mentor." Id.

Plaintiff texted his pledge master that Roe would be his mentor for the pre-law fraternity. Id. at ¶ 121. Later that day, however, Roe called Plaintiff to tell him that she was not comfortable about what had happened between them. Id. at ¶ 122. She wanted "space." Id. Plaintiff informed his pledge master[3] that "something happened" between him and Roe, and that Roe would no longer serve as a mentor. Id. at ¶ 123. The president of the fraternity where the party occurred called Plaintiff that evening to tell him that Plaintiff "was no longer welcome as a member of" that fraternity. Id. at ¶ 124.

Plaintiff texted Roe about the "situation." Id. at ¶ 125. He expressed "confusion." Id. He and Roe had "just spoken about the encounter a few hours" before, and Roe had not been "upset about it." Id. Roe did not respond. Id. Instead, Plaintiff claims, "Roe embarked on a smear campaign against Plaintiff, falsely informing other members of the fraternity that she had been violently attacked and raped by Plaintiff, that she had bruises, and that she went to the hospital." Id. at ¶ 126.

_____

[3]The Complaint is vague in explaining what "pledge master" means. From context, it appears to the Court that at the relevant time Plaintiff was connected to two different "fraternities." One was a "pre-law" fraternity that included Roe as a member and possible mentor for Plaintiff. Plaintiff also appears to have been connected to the Delta Kappa Epsilon fraternity, where the party in question occurred. The Complaint is unclear about these relationships, and about how his interaction with Roe affected them.

8

On March 26, 2021, Syracuse's Office of Student Rights and Responsibilities ("OSRR") issued mutual no-contact orders to Plaintiff and Roe.  Id. at ¶ 127.  Roe had reported her allegations to the president of the fraternity where the events in question occurred, and the fraternity president reported the allegation to the OSSR.  Id.  After the no contact order, rumors of the events spread around campus, and Plaintiff heard about the allegations from "more and more students[.]" Id. at ¶ 128.  Plaintiff posted a private Snapchat[4] story on April 12, 2021.  Id. at ¶ 129.  Plaintiff hoped to "clear up the allegations without violating the no contact order."  Id.  He "detailed the encounter while redacting names."  Id.  Roe saw the Snapchat story and contacted the Department of Public Safety ("DPS").  Id. at ¶ 130.  A DPS officer visited Plaintiff to remind him of the no-contact order.  Id.  The officer confirmed that Plaintiff had not violated the order.

OSSR sent Plaintiff a Notice of Investigation ("NOI") concerning Roe's allegations on April 22, 2021.  Id. at ¶ 131.  After he received the NOI, Plaintiff spoke with his mother.  Id. at ¶ 132.  Plaintiff told his mother that he had met Roe as a potential mentor, and "did not flirt with her[.]" Id.  He explained that "Roe later came onto him sexually in a private setting." Id.  After this conversation, "Plaintiff recognized that Roe had sexually assaulted him, and used her platform as a mentor to pressure him into a sexual relationship when Plaintiff was only seeking out a professional relationship."  Id. Plaintiff then filed a Complaint with the Syracuse Title IX office, 'stating that Roe had sexually assaulted him and the he had not given affirmative consent to the sexual encounter."  Id. at ¶ 133.  Roe received an NOI from

---

[4]Plaintiff's Complaint explains that "[a] private Snapchat story is a post that stays online for 24 hours and can only been [sic] seen by certain friends selected by the user." Complt. at n.5.

the OSRR on May 10, 2021 regarding this allegation.  Id. at ¶ 134.

The University's assigned Title IX investigator, Bernerd L. Jacobson, reached out to Plaintiff and Roe on May 14, 2021.  Id. at ¶ 135.  Jacobson sought to schedule interviews with Plaintiff, Roe, and their witnesses.  Id.  Plaintiff spoke with Jacobson on May 21, 2014.  Id. at ¶ 136.  Plaintiff explained that, based on the "power dynamics" between him and Roe, he could not "stop the encounter and Roe's advances."  Id.  He claimed that he had not provided affirmative consent for the sexual encounter.  Id.  He denied that he had assaulted Roe, but instead insisted that "Roe was an active and willing participant."  Id.  Plaintiff also reported that Roe had not consumed alcohol in front of him at the party and had not shown any "signs of intoxication."  Id. at ¶ 137.  Roe met with Jacobson on May 25, 2021.  Id. at ¶ 138.  Roe claimed that she had "'blacked out,'" but was still able to offer a "descriptive memory of the alleged incident with Plaintiff."  Id.

Jacobson interviewed sixteen people from the party "and/or" the fraternity where the party occurred.  Id. at ¶ 139.  "[A] considerable number of Roe's witnesses provided unsupported testimony that was even disproven by video surveillance footage from the party."  Id. at ¶ 140.  For instance, one of Roe's friends, E.D., told Jacobson that she saw Roe alone at the party, and that Roe seemed very intoxicated and "simply stared at E.D. and walked away" when E.D. greeted Roe.  Id. at ¶ 141.  Video footage, however, showed E.D. and Roe interacting, and that Plaintiff was with her.  Id. at ¶ 142.  Roe and E.D. greeted each other and embraced.  Id.  Likewise, J.Y. told Jacobson that Roe was "heavily under the influence" that night.  Id. at ¶ 143.  When questioned about his specific interactions with Roe, however, J.Y. reported that "immediately prior to her entry" into the fraternity house, "Roe was not on the verge of blacking out, but was having a good time."

10

Id.

Jacobson also interviewed the four individuals who entered and left the room shortly before the events in question occurred.  Id. at ¶ 144.  Plaintiff alleges that all four "observed Roe directly before the sexual encounter[.]"  Id.  All four, he claims, "confirmed that Roe was not incapacitated."  Id.  Plaintiff alleges that "J.A. stated that Roe introduced herself to J.A. prior to entering the room and that they engaged in small talk."  Id. at ¶ 144(a).  J.A. reported that Roe "was on top of Plaintiff" when J.A. entered the room.  Id.  He also stated that "both Plaintiff and Roe looked completely sober."  Id.  He was shocked later when he heard Roe's allegations.  Id.  J.D., a woman, reported that she was not concerned about the situation when she left the room.  Id. at ¶ 44(b).  Plaintiff alleges that "as a female," J.D. "is congnizant of warning signs of incapacitation from other women[.]"  Id.  While E.R. reported that Roe was on Plaintiff's lap when E.R. entered the room, E.R. "did not see anything out of the ordinary."  Id. at ¶ 144(c).  E.R. and Roe "engaged in verbal introductions in the room[.]"  Id.  Roe asked E.R. the name of E.R.'s boyfriend.  Id. J.M. stated that Plaintiff and Roe "looked extremely intimate in the room," but did not appear "intoxicated."  Id. at ¶ 144(d).  J.M. told Plaintiff to lock the door when the four other students left the room.  Id. According to J.M., he would not have given such instructions "if he felt that either Plaintiff or Roe was too intoxicated[.]"  Id.

Jacobson emailed Plaintiff and Roe to inform them that they had access to the investigative file on June 24, 2021.  Id. at ¶ 145.  That access included evidence and witness interviews.  Id.  Both parties had until July 11, 2021 to file a response to the file.  Id. Plaintiff responded on July 10 and July 11, 2021.  Id. at ¶ 146.  He requested that Roe be asked about any substances she may have taken on the day of the alleged incident that

11

could have affected her memory.  Id.  One of the witnesses had stated that Roe may have consumed medication before the encounter in question occurred.  Id.  Jacobson conducted follow-up interviews of Plaintiff and Roe on July 28, 2021.  Id. at ¶ 147.  Though Jacobson asked "almost all" of Roe's follow-up questions to Plaintiff, he did not ask Roe about medications.  Id. at ¶ 148.

Jacobson issued his Investigative Report on September 16, 2021.  Id. at ¶ 149.  That Report, Plaintiff claims, "was fraught with inconsistencies and errors and was clearly fashioned in a manner to have Plaintiff found responsible."  Id. at ¶ 150.  Plaintiff emailed Jacobson a response to the Report on September 19, 2021.  Id. at ¶ 151.  Plaintiff noted that the Report lacked information on witnesses' "observation of Plaintiff and Roe's relative intoxication when Plaintiff and Roe were in the upstairs room, including that both Plaintiff and Roe appeared 'dead sober[.]'"  Id.  Plaintiff requested that those "observations be included" in the Report.  Id.  Jacobson did not add that information to the Report.  Id.

A live hearing took place on October 26-28, 2021.  Id. at ¶ 153.  Plaintiff alleges that, while the hearing officer took testimony from both his and Roe's claims, "Plaintiff was discriminated against on the basis of his gender and treated differently than Roe due to his male status."  Id. at ¶ 154.  Plaintiff alleges that, though he had brought a complaint in addition to responding to one, "Plaintiff was grilled with questions regarding his claims," which "amount[ed] to unveiled victim blaming."  Id. at ¶ 155.  After Plaintiff testified that he had not resisted or said no to sexual contact, "the Hearing Officer drew conclusions that Plaintiff was not sexually assaulted."  Id.  The Hearing Officer also permitted "Roe's advisor to inappropriately question Plaintiff as to whether it would have been 'possible' for Plaintiff to escape Roe's advances, as well as whether Plaintiff's body responded to Roe's advances

12

by becoming erect." Id. at ¶ 156.   The hearing officer did not subject Roe to the same type

of questioning; the hearing officer tried not to "'retraumatize' Roe, and allowed her to explain

away the inconsistencies in her stories and the stories of her witnesses as a result of

alleged trauma." Id. at ¶ 157.  The hearing officer also did not ask Roe about "her ability to

'escape' or how her 'body responded' to the sexual encounter."  Id.

The hearing officer issued a Decision Letter on November 29, 2021.  Id. at ¶ 158.

Plaintiff alleges that "an even more egregious manner than the hearing," the Decision Letter

"dismissed any inconsistencies or weaknesses in Roe's testimony[.]" Id. at ¶ 159.  Instead,

the Letter "emphasized facts detrimental to Plaintiff's testimony . . . to find Plaintiff

responsible for touching Roe's breasts without consent."  Id.  The Decision Letter, for

example, called into question a detailed timeline created by the Investigator after reviewing

video surveillance. Id. at ¶ 160.  The Letter relied on testimony from witnesses who

admitted their recollection of events was weak to reach this conclusion.  Id.  The Letter also

misstated when students entered the upstairs bedroom and found Roe unconscious.  Id. at

¶ 161.  The Letter concluded that other students found Roe unconscious sometime

between 2:00 a.m. and 2:41 a.m., even though the Investigator had found that the other

students found Roe when they entered the bedroom at 2:41 a.m.  Id. This distortion made it

appear that the students found Roe shortly after her sexual encounter with Plaintiff, though

the evidence indicated that an hour had likely passed between the time of the sexual

encounter and the students seeing Roe in the bedroom. Id. at ¶ 162.  Plaintiff alleges that

"[t]he failure of the Hearing Officer to make a factual determination as to a critical timeframe

and the careless act of giving credibility to disproven approximations by non-testifying

and/or under-the-influence witnesses improperly impacted the outcome of the hearing."  Id.

at ¶ 163.

Plaintiff also claims that the Hearing Officer without cause "discredited the testimony of the four impartial students that were in the room with Plaintiff and Roe *immediately prior* to the sexual encounter where each student unequivocally stated that Roe did not appear intoxicated[.]" Id. at ¶ 164.  The Hearing Officer, Plaintiff claims, found "that the students came into the room for their own reasons and did not appear to have an interest in observing Roe's behavior."  Id.  Instead, Plaintiff alleges, the Hearing Officer relied on the accounts of two students, E.D. and J.Y., "two witnesses [who] did not testify at the hearing." Id. at ¶ 165.  The use of these witnesses, Plaintiff claims, demonstrate that the "Investigative Report was fashioned in a way to have Plaintiff found responsible."  Id. at ¶ 166.  The Decision Letter, for instance, credited only part of the testimony from J.Y.  Id. The Letter credited part of the testimony that indicated that Roe was intoxicated and "'not okay'" on the night in question, but failed to point to other testimony from J.Y. that indicated that Roe "was 'not on the verge of blacking out' and 'having a good time.'"  Id.  Plaintiff thus claims that "the Investigator cherry-picked witness statements to paint Roe as incapacitated and Plaintiff as responsible, while burying or ignoring any evidence or statements that could negatively affect Roe's credibility."  Id. at ¶ 167.

Plaintiff's Complaint points to additional evidence he claims supports a finding that the Letter ignored evidence that undermined Roe's version of events.  Plaintiff points out that the Letter focuses on Roe's behavior before she arrived at the fraternity house and her behavior at least an hour after the alleged sexual encounter.  Id. at ¶ 168.  The Letter does not, however, address whether Plaintiff was capable of consenting at the time of the events in question or whether Plaintiff had any reason to believe Roe could not consent.  Id.  He

14

further contends that the "Letter also highlighted two instances of video footage where Roe at one point appears to steady herself" but "ignored substantial video footage of Roe carrying herself without issue and walking with purpose." Id. at ¶ 169.

Defendant argues that these facts are insufficient to state an erroneous outcome claim. First, Defendant contends, none of the alleged facts serve to case doubt on the outcome of the hearing by indicating evidentiary weaknesses or significant unfairness. The evidence does not indicate that the Hearing Officer ignored evidence, Defendant claims; instead, the Hearing Officer made permissible credibility determinations after considering the evidence. Plaintiff may disagree with the Officer's conclusions, but disagreeing with conclusions does not state a claim. Moreover, Plaintiff's claims that the Hearing Officer ignored inconsistencies in Roe's testimony are merely conclusory and fail to state a claim. The Hearing Officer considered evidence Plaintiff claims she ignored.

Plaintiff's factual allegations, related above, are sufficient to cast an articulable doubt on the outcome of his disciplinary hearing. He alleges that the University's findings that Roe was an unwilling participant in sexual contact with him are undermined by a number of pieces of evidence from the night in question, which he contends that the University ignored. The University allegedly failed to credit testimony that from the four students who entered the room shortly before sexual encounter, which seemed to indicate nothing amiss. The University also allegedly failed to credit evidence that indicated Roe was not extremely intoxicated, incapable of consent, or incoherent on the night in question, but instead pointed only to inculpatory evidence. Such allegations cast an articulable doubt on the outcome of the disciplinary proceeding and are sufficient to state a claim in that respect. While Syracuse defends the veracity of the outcome of the proceeding, the Court here decides a

15

motion to dismiss, and must accept all well-pleaded allegations in the Complaint as true.

The question for the Court is now whether Plaintiff has pled facts sufficient to make it plausible that gender was a motivating factor behind the erroneous outcome.

In Columbia University, the Second Circuit vacated a district court's dismissal of a complaint that alleged that Columbia University had violated Title IX by acting with gender bias in investigating and suspending a male student for an alleged sexual assault. Columbia Univ., 831 F.3d at 48.  In reaching that conclusion, the Second Circuit found the complaint in that action pled "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss[.]"  Id. at 56.  The allegations that supported that inference in Columbia University included:

> (1) the investigator and hearing panel did not seek out all witnesses that the plaintiff had identified as sources of information favorable to him; (2) the investigator and panel failed to comply with Columbia University's procedures designed to protect accused students; (3) the investigator, the panel, and the reviewing Dean reached conclusions that were erroneous and contrary to the weight of the evidence; (4) during the period before the disciplinary hearing, both the student body and public media heavily criticized Columbia University and accused it of not taking seriously complaints of female students alleging sexual assault by male students; and (5) Columbia University was aware of and sensitive to those criticisms.

Rolph v. Hobart & William Smith Colleges, 271 F. Supp. 3d 386, 401 (W.D.N.Y. 2017)(citing Columbia Univ., 831 F.3d at 56–57).

In terms of gender bias, Plaintiff's Complaint alleges, as explained above, that Jacobson and the UCB proved more inclined to believe Roe's allegations than his denials. Plaintiff begins his Complaint by describing the "background" concerning sexual misconduct allegations on college campus created by policies put in place during the Obama

16

administration.  See Complt. at ¶¶ 16-38.[5]  Plaintiff alleges that in 2011, the Department of

Education's Office for Civil Rights ("OCR") sent a "guidance letter to colleges in receipt of

federal funding."  Id. at ¶ 16.  The letter became known as the "Dear Colleague" letter.  Id.

That letter "advised recipients that sexual violence constitutes sexual harassment within the

meaning of Title IX . . . and its regulations, and . . . directed schools to 'take immediate

action to eliminate the harassment, prevent its recurrence and address its effects."  Id. at ¶

17.  Plaintiff alleges that the letter came in response to reporting about sexual violence on

campus that cast young men as maintaining a "cultural adherence to the sexual aggressor

role."  Id. at ¶ 18.  Plaintiff claims that the letter relied on "faulty statistics" about the number

of victims of sexual assault "in sounding its 'call to action' for campuses nationwide."  Id. at

¶ 19.  As a result, Plaintiff alleges, the OCR "minimized due process protections for the

accused by, among other things, mandating the adoption of a relatively low burden of

proof–'more likely than not'–in cases involving sexual misconduct, expressly prohibiting

colleges from applying a higher standard of proof."  Id. at ¶ 20.  OCR also allegedly "advised

schools" to "'minimize the burden on the complainant' . . . and focus on victim advocacy" in

address sexual misconduct complaints.  Id. at ¶ 21.  OCR discouraged allowing cross-

examination in hearings to avoid causing trauma for the alleged victim.  Id. at ¶ 22.

Plaintiff alleges that the letter changed university practices around complaints of

sexual misconduct.  The letter was purportedly "guidance," but the Department of Education

acted as if the suggestions in the letter were "a binding regulation and pressured colleges

and universities to . . . pursue investigations of sexual assault on campus" in an aggressive

[5]The Court is familiar with these allegations, as they have appeared in a number of
other cases filed in this and other districts alleging sex discrimination in this context.

fashion.  Id. at ¶ 23.  Institutions began using disciplinary procedures to adjudicate

misconduct cases more frequently and in a different way than they had previously.  Id. at

¶ 24.  Schools also changed their sexual assault and sexual harassment policies.  Id. at ¶

25.

In April 2014 OCR issued additional guidance and directives in a document entitled

"Questions and Answers on Title IX and Sexual Violence."  Id. at ¶ 26.  The document

addressed policies on campus and listed "procedures colleges and universities 'must'

employ 'to prevent sexual violence and resolve complaints[.]'"  Id.  The document pointed to

"the elements that 'should be included in a school's procedures for responding to

complaints of sexual violence.'"  Id.  OCR "advised schools to adopt a trauma informed

approach" that aimed to avoid causing "'additional trauma to the complainant.'"  Id. at ¶ 27.

Plaintiff contends that this document placed limits on an accused student's ability to offer a

defense "by reducing or eliminating the ability to expose credibility flaws in the allegations

made against them."  Id. at ¶ 28.  In addition to this April guidance, the White House issued

a report that warned "that if the OCR finds a school in violation of Title IX, the 'school risks

losing federal funds'" and risks federal enforcement actions.  Id. at ¶ 30.  OCR also "hired

hundreds of additional investigators and began conducting hundreds of "investigations of

colleges for the potential mishandling of complaints of sexual misconduct."  Id. at ¶ 32.

Plaintiff alleges that "[t]he threat of revocation of federal funds–the ultimate

penalty–was a powerful tool in motivating colleges to aggressively pursue and punish male

students accused of sexual misconduct."  Id. at ¶ 33.  Plaintiff points to statements from

college officials and administrators concerning their fears of losing funds and how those

fears led to procedures that limited the rights of the accused.  Id. at ¶¶ 33-37.  Plaintiff

alleges that, in this atmosphere, "educational institutions, like Syracuse, limited procedural protections afforded to males, like John Doe, in sexual misconduct cases." Id. at ¶ 38.

Plaintiff alleges that Betsy DeVos, who became Secretary of Education in 2017, concluded that the procedures urged by the previous administration had limited the due process rights of the accused. Id. at ¶¶ 39-41. DeVos stated that "'[e]very student accused of sexual misconduct must know that guilt is not predetermined,' and that 'any school that uses a system based toward finding a student responsible for sexual misconduct also commits discrimination." Id. at ¶ 42. DeVos declared that "'[d]due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one.'" Id. OCR formally rescinded the 2011 guidance letter and the 2014 advice in 2017, and put in place interim guidance. Id. at ¶ 44. The new guidance emphasized that earlier rules had limited due process for the accused and "prohibit[ed] universities from relying on fixed rules or assumptions that favor complainants over respondents." Id. at ¶¶ 45-46. That guidance also directed universities not to rely on "'sex stereotypes or generalizations,'" or risk violating Title IX. Id. at ¶ 47. The guidance emphasized "prompt and *equitable* resolution of complaints of sex discrimination, including sexual misconduct." Id. at ¶ 48 (emphasis added in complaint). To achieve this end, OCR required that grievance procedures include measures that "ensur[e] an *adequate, reliable, and impartial* investigation of complaints.'" Id. (emphasis added in complaint). Investigations must use all of the available evidence and examine the circumstances of each case. Id. at ¶ 49. All parties to the investigation must have the same rights. Id. at ¶ 50. The guidance also directed schools to use a "preponderance of the evidence" or a "clear and convincing evidence" standard in adjudicating complaints. Id. at ¶ 51. That

19

standard should be the same standard used in evaluating other disciplinary complaints.  Id.

Plaintiff alleges that Syracuse continued to use policies criticized by the 2017 guidance from the Department of Education, which "suggests that the policies and procedures in place at Syracuse during the investigative phase" of Doe's "disciplinary proceeding–were tailored . . . to comply with" the earlier standards "under the loss of federal funding–were unfair and . . . contrary to the goal of gender equity in Title IX proceedings." Id. at ¶ 52.  Despite changes to regulations proposed by the Trump administration, Plaintiff contends, "colleges and universities," including the Defendant, "mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is gender biased enforcement of Title IX." Id. at ¶ 53-54.  Moreover, he contends, institutions typically do little to protect the interests and rights of respondents in sexual misconduct cases: "[w]hile alleged victims have entire departments of advocates funded by the institutions dedicated to their needs, only 13% of colleges and universities have a staff member reach out 'directly to responding parties about support services available.'" Id. at ¶¶ 55-56.

The Department of Education promulgated new Title IX regulations in May, 2020.  Id. at ¶ 57.  Those new regulations provided more procedural rights for accused students.  Id. at ¶ 58.  Syracuse revised its policies in fall 2020 to comply with these new standards, and Plaintiff's hearing and appeal took place under these revised policies.  Id. at ¶¶ 59-60. Plaintiff alleges, however, that "Syracuse continued to apply its updated policies with a gender bias against males, like Doe accused of sexual misconduct, resulting in an erroneous finding of responsibility against Doe."  Id. at ¶ 61.

Plaintiff's Complaint also alleges that "Syracuse enacted victim-centered policies and

procedures for resolution of sexual assault complaints." Id. at ¶ 182. Syracuse and other colleges and universities adopted such policies because they were guided by OCR's 2011 guidance and the threats of loss of federal funding that accompanied that guidance. Id. at ¶ 183. Plaintiff further alleges that "[i]n recent years, and during the pendency of [his] disciplinary proceeding, Syracuse has faced significant pressure to make findings of responsibility against males accused of sexual assault due to investigations of OCR complaints." Id. at ¶ 184. Plaintiff further alleges that Syracuse faced an open OCR investigation regarding mishandling of an OCR complaint while his proceeding was pending. Id. at ¶ 185. Moreover, he contends, Syracuse faced pressure from news media and the Syracuse student body "for the way it has handled sexual assault, and in particular sexual assault against" women. Id. at ¶ 186. As a result, Plaintiff asserts, "Syracuse was motivated to favor Roe, as the female accuser" over "Doe, the male respondent[.]" Id. at ¶ 187. Syracuse "did not want further criticism that it failed to protect female students from assault or [failed] to take the complaints of female students seriously." Id.

Plaintiff describes conditions on the Syracuse campus in 2014 and 2016 that he alleges created an environment on campus that favored accusers in sexual assault complaints. Id. at ¶¶ 188-193. In May, 2014, Syracuse announced to students that the University would close the Advocacy Center for Sexual Assault Victims and direct that "all sexual assault related complaints and concerns" be addressed by the Syracuse Counseling Center. Id. at ¶ 188. Students found this decision "'problematic,'" and feared that the University had limited protection for victims of assaults. Id. at ¶ 189. Plaintiff alleges that "Syracuse's policy change detracted from the importance of sexual assault prevention and advocacy." Id. at ¶ 190. By February 2016, Syracuse had become "the first private

university to back the Campus Accountability and Safety Act," a bill that pressured "colleges to respond to reported sexual violence" and "requires colleges to make annual, anonymous surveys about sexual violence on campus, and forces the federal government to improve its disclosure of investigations into colleges accused of mishandling sexual violence." Id. at ¶¶ 191-192.  Plaintiff asserts, "on information and belief," that "Syracuse sought to correct its track record of mishandling sexual violence against women and to create an image that it was 'tough' on sexual violence through its early backing" of the Act.  Id. at ¶ 193.  To meet this aim, Plaintiff alleges, "Syracuse sought to overcorrect for its prior mishandling of sexual assault matters by depriving accused males," like the Plaintiff, "of an impartial disciplinary hearing."  Id. at ¶ 196.  Likewise, Syracuse allegedly had a reputation for a large number of sexual assaults on campus, and "deprived [Plaintiff] of procedural protections and operated with a gender bias against [Plaintiff] in order to appear 'tough' on sexual aasault." Id. at ¶ 204.  Plaintiff further contends that this desire to appear to take claims of sexual violence seriously and to deny the accused due process came in part in response to lawsuits filed in 2020 that alleged that the University had previously overlooked claims of sexual abuse of children on campus.  Id. at ¶¶ 199-200.

Plaintiff further alleges that "Syracuse's leadership exerted pressure, ideological and otherwise, to find against males accused of sexual misconduct and to deprive them of due process."  Id. ¶ 207.  The University's "rush" to find Plaintiff liable for sexual misconduct, Plaintiff claims, also came in response "to pressure from the University's leadership and from local and student media[.]" Id. at ¶ 208.  "[T]he University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus." Id. at ¶ 209.  Plaintiff further alleges, "on information and belief," that "Syracuse has

22

repeatedly conducted gender-biased investigations, and imposed disproportionate sanctions against male students accused of misconduct." Id. at ¶ 210.

Plaintiff's allegations that Syracuse assumed he was guilty because he was a male accused of sexual assault, and that Syracuse assumed that Roe was truthful because of her gender, border on being "mere conclusory statements . . . not entitled to the assumption of truth." Iqbal, 556 U.S. at 678. While these issues standing alone "may not necessarily support an inference of bias on account of gender," Plaintiff here, like the plaintiffs in Columbia University and Rolph, has coupled his factual allegations with the allegations of public pressure on the University to prosecute sexual abuse allegations more aggressively. Rolph, 271 F. Supp. 3d at 402. As in these other cases, Plaintiff claims his disciplinary proceeding occurred in the context of public criticism of the University's handling of sexual abuse complaints against males. A reasonable inference could be drawn that Syracuse's agents were "motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male." Columbia Univ., 831 F.3d at 58. Plaintiff has presented allegations of facts supporting a minimal plausible inference of discriminatory intent. Plaintiff has therefore stated an erroneous outcome claim, and the motion will be denied on this basis.

### ii.    Selective Enforcement

Under Title IX, a selective enforcement claim "asserts that, regardless of the student's guilt of innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Yusuf v. Vassar College, 35 F.2d 709, 715 (2d Cir. 1994). As with an erroneous outcome claim, "wholly conclusory allegations [do not] suffice for purposes of Rule 12(b)(6)." Id. To prevail on such a claim, "'[a male plaintiff]

23

must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University.'" <u>Doe v. Colgate Univ.</u>, 457 F.Supp.3d 164, 172 (N.D.N.Y. 2020) (quoting <u>Yu v. Vassar Coll.</u>, 97 F.Supp.3d 448, 480 (S.D.N.Y. 2015)). A plaintiff must also "'show that 'the University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings.'" <u>Id.</u> (quoting <u>Yu</u>, 97 F.Supp.3d at 480).  A plaintiff must "'allege particular circumstances suggesting a meaningful inconsistency in punishment and particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency.'" <u>Id.</u> at 173 (quoting <u>Prassad v. Cornell Univ.</u>, No. 5:15-CV-322, 2016 U.S. Dist. LEXIS 161297, *18 (N.D.N.Y. Feb. 24, 2016)).

Defendant argues that Plaintiff fails to allege that either the decision to initiate the disciplinary action or the severity of the penalty was affected by the Plaintiff's gender.  While Plaintiff points out that the outcome of his claim and Roe's claim were different, Defendant insists that–other than some "differences in investigative techniques" and claims that Syracuse felt pressure to find against men in such cases–Plaintiff has not alleged facts that suggest that bias was the motivating factor in the decision.  Plaintiff responds that his claim is sufficient because he alleges that "Syracuse aggressively investigated Roe's claims of sexual misconduct against Plaintiff, but did not do the same with regard to Plaintiff's claims against Roe."  Both students had reported behavior that constituted sexual misconduct if true, but Syracuse only took Roe's claims seriously.  The two were also similarly situated, because Roe was the subject of Plaintiff's counter-complaint.  Plaintiff claims he was treated differently from Roe because "Syracuse tossed Doe's claims against Roe by the wayside" and "Syracuse victim-shamed Doe by questioning him for even bringing a

24

complaint forward, whereas the University pursued Roe's allegations seriously."  Plaintiff also contends that allegations in the Complaint that Syracuse "routinely punishes male respondents more severely than non-male respondents" support his claim that gender motivated the differences in treatment.

Plaintiff's selective enforcement claim alleges that Syracuse "subjected [Plaintiff] to disparate treatment in comparison to Jane Roe–a similarly situated female–and imposed a more severe sanction upon him."  Complt. at ¶ 237.  Each student filed a complaint, and the University "consolidated" those claims "into one investigation because they stemmed from the same alleged incidents."  Id. at ¶ 238.  Plaintiff alleges that the two "were similarly situated because they were both complainants and respondents."  Id. at ¶ 239.  The two faced different outcomes, however, since Syracuse found Plaintiff responsible for Roe's allegations and expelled him and did not find Roe responsible and did not impose any sanctions.  Id. at ¶ 240.  Plaintiff relies on the same sorts of allegations about a campus climate that created an inclination to credit women who accused men of sexual assault to allege a gender bias in enforcement.  Id. at ¶ 241.  Plaintiff does not allege the existence of any other comparators.

This case is similar to Doe v. Haas, 427 F.Supp.3d 336 (E.D.N.Y. 2019).  In that case, the Plaintiff had sex with a State University of New York at Stony Brook classmate, who afterwards accused him of non-consensual conduct.  Id. at 340-341.  Plaintiff could not remember the incident because he was too intoxicated.  Id. at 341.  When the classmate filed a complaint against him, "Plaintiff filed a cross-complaint based on his own inability to consent to intercourse on account of his 'considerable intoxication'" Id.  The University undertook disciplinary hearings and both students faced charges.  Id.  After an investigation

25

and a hearing, the University found the Plaintiff responsible on the charges and did not find

the other student responsible.  Id. at 344.  After Plaintiff lost his appeal, the University

suspended him, took away a scholarship, and made a permanent record of the findings on

his transcript.  Id. at 345.  Plaintiff sued, raising, among other causes of action, Title IX

erroneous outcome and selective enforcement claims.  The trial court denied Defendants'

motion to dismiss with respect to Plaintiff's erroneous outcome claim but granted the motion

with respect to his selective enforcement claim.  The Court found:

> In this case, Plaintiff relies solely upon the "similarly situated female party BG who
> was accused of violating the same Sexual Misconduct provisions of SBU's Code as
> Plaintiff."  That reliance is misplaced.
>
> Turning first to the decision to initiate [the] proceeding, proceedings were initiated
> against both Plaintiff and BG.  Thus, there is no apparent difference in the decision to
> initiate proceedings between the two.  Similarly, the use of BG as a comparator vis a
> vis punishment is inapposite given that BG was found not responsible whereas
> Plaintiff was found responsible.  Indeed, Plaintiff's arguments in support of his
> selective enforcement claim all center around the evidence presented at the hearing
> and the differences [between] the hearing panel's treatment of him and PG.  While
> those allegations are relevant to the issue of bias vis a vis an erroneous outcome
> case, they do not support a plausible selective enforcement claim.  Absent from the
> Complaint are any allegations that disciplinary proceeding[s] were not initiated solely
> against similarly situated females or that similarly situated females found guilty of the
> same offense received a less severe penalty.

Id. at 357 (internal citation omitted).

The Court finds that logic persuasive.  The claim here is for selective enforcement,

not erroneous outcome.  The Court has found that Plaintiff's allegations support an

erroneous outcome claim because Plaintiff alleges facts that call into question the

conclusions of the hearing officer and facts that support a claim that gender bias led to that

potentially erroneous outcome.  Here, however, he has alleged that both he and Roe were

the subject of an investigation and disciplinary hearing after being accused of sexual

misconduct.  He also alleges that the University came to different conclusions about their

culpability.  As the only person found culpable, Plaintiff was the only party to receive

punishment.  Plaintiff has not alleged that the University refused to undertake investigations

of female classmates accused of conduct similar to his.  He does not point to any other

female classmates found liable for sexual misconduct under similar circumstances who

faced different penalties than he did.

Plaintiff has therefore failed to state a selective enforcement claim.  The Court will

grant the Defendant's motion in this respect.  Because Plaintiff could conceivably allege that

other similarly situated female students were treated differently from him during an

investigation of sexual misconduct allegations, the Court will grant the motion without

prejudice to repleading.  Plaintiff will be granted leave to re-plead if he can make such

allegations in good faith.

## B.    Breach of Contract

Plaintiff's third cause of action alleges breach of contract.  He contends that

Syracuse breached its express and/or implied agreements with him, and that these

"breaches" caused him damage.  Defendants argue that Plaintiff has failed to state a claim

because he has not alleged any specific promises Syracuse made and failed to keep.

"'In New York, the relationship between a university and its students is contractual in

nature.'"  Xiaolu Peter Yu v. Vassar College, 97 F. Supp. 3d 448, 481 (S.D.N.Y.

2015)(quoting Papaspiridakos v. Educ. Affiliates, Inc., 2013 WL 4899136, at *3 (E.D.N.Y.

Sept. 11, 2013).  "[A]n implied contract is formed when a university accepts a student for

enrollment: if the student complies with the terms prescribed by the university and

completes the required courses, the university must award him a degree.  The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student."  Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011)(internal quotation marks and citations omitted).

In New York, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach."  PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 16 N.Y.S. 3d 298, 2015 N.Y. App. Div. LEXIS 6711 at *2 (2d Dept. Sept. 16, 2015).  "A student may sue his college or university for breach of an implied contract in certain situations," Routh, 981 F. Supp. 2d at 207, but "[t]he application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014).

"'[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.'"  Habitzreuther v. Cornell Univ., No. 5:14cv1229, 2015 WL 5023719, at *4 (N.D.N.Y. Aug. 25, 2015) (quoting Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ., 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)).  Thus, while "[a] college is 'contractually bound to provide students with the procedural safeguards that it has promised,'" Xiaolu Peter Yu, 97 F. Supp. 3d at 481 (quoting Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 243 (D. Vt.1994)), a plaintiff must identify a specific promise or obligation that was breached in order to pursue a contract claim. See Okoh v. Sullivan, 2011 U.S. Dist. LEXIS 18524, at * 14-15 (S.D.N.Y. Feb. 24, 2011) ("the mere allegation of mistreatment without the identification of a specific breached

28

promise or obligation does not state a claim on which relief can be granted").  "Conclusory

allegations that a defendant breached an agreement are insufficient to support a breach of

contract claim." Habitzreuther, 2015 WL 5023719, at *5 (N.D.N.Y. Aug. 25, 2015); see Ward

v. N.Y. Univ., 2000 WL 1448641, at *5 (S.D.N.Y. Sept.28, 2000)("[B]ald assertions and

conclusory allegations claiming that the University's rules or procedures were not followed,

do not state a valid claim."); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y.

1998)("mere allegation of mistreatment without the identification of a specific breached

promise or obligation does not state a claim on which relief can be granted").

Plaintiff's Complaint alleges that "a contractual relationship existed between

Syracuse and Plaintiff by virtue of Plaintiff's enrollment at Syracuse and as defined by and

through Syracuse's polices and procedures governing the student disciplinary system,

including but not limited to the 2019 Title IX Policy and the 2020 Title IX Policy."  Complt. at

¶ 246.  His breach-of-contract count alleges that both an actual contract and a covenant of

good faith and fair dealing existed, and that the University breached the contract by, among

other acts:

     a.     Failing to provide Plaintiff with a fair and impartial investigation;

     b.     Failing to provide Plaintiff with a meaningful opportunity to respond to the Investigation Report;

     c.     Failing to treat Plaintiff's report against Roe equally to Roe's report against Plaintiff, and instead treating Plaintiff as the perpetrator;

     d.     Failing to allow Plaintiff to be free from suggestion that he was at fault for his complaint against Roe, and probing him with victim-shaming questions at the hearing; and

     e.     Failing to provide Plaintiff with an adequate opportunity to appeal the decision.

Id. at ¶ 251.  Plaintiff further contends that "Syracuse . . . breached the implied covenant of

good faith and fair dealing by applying its policies in a discriminatory manner." Id.

Plaintiff's Complaint alleges that "[u]pon Plaintiff's matriculation to Syracuse, Plaintiff and Syracuse also became mutually bound by the 2021-2022 'Sexual Harassment, Abuse, and Assault Prevention Policy" and the Procedures for Responding to Reports of Student Violations of the Sexual Harassment, Abuse, and Assault Prevention Policy . . . which are the applicable policies for Syracuse's Title IX procedures." Id. at ¶ 69. Plaintiff alleges that Syracuse applied these polices differently for men than for women, causing men to face harsher penalties. Id. at ¶ 72. One provision of the policy provides that "'[p]arties and their advisors will have the opportunity to view the evidence gathered, to view the investigation report, and to submit a written response to each.'" Id. at ¶ 73. Plaintiff alleges that the University breached this promise "because Plaintiff was not given a meaningful opportunity to respond to the Investigation Report, as the requests in Plaintiff's response were nearly entirely ignored, while Roe's requests were catered to and added to the Investigative Report." Id. at ¶ 74. Further, Plaintiff alleges, the policy provides that "students have the right to 'participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard." Id. at ¶ 75. Syracuse allegedly breached this promise "because the Investigator conducted a biased investigation wherein Roe's witnesses were given more credibility, despite inconsistencies in their statements, in order to have Plaintiff found responsible." Id. at ¶ 76. Plaintiff further alleges that Syracuse violated a promise that students would "have disclosures of Dating or Domestic Violence, Stalking, Sexual Assault and other forms of Sexual harassment treated seriously" when the University undertook an investigation "fraught with gender bias, wherein Plaintiff's complaint against Roe was treated with scrutiny, while Roe was allowed to explain away the inconsistencies in

30

her complaint against Plaintiff." Id. at ¶¶ 77-78.  The University also allegedly breached a promise to avoid "any suggestion that the reporting individual is at fault . . . or should have acted in a different manner to avoid such crimes or violations" when Syracuse "probed" Plaintiff and engaged in "victim shaming when he was questioned about his complaint against Roe at the hearing, meanwhile Roe was not met with the same scrutiny." Id. at ¶¶ 79-80.  Syracuse also breached a promise to provide "at least one level of appeal" when the University failed to provide Plaintiff "a meaningful opportunity to appeal, as the length of his appeal was limited to only ten pages and the procedural grounds on which he could appeal were limited." Id. at ¶¶ 81-82.

Defendant argues that Plaintiff's claims here do not cite to "any specific rule or process that Syracuse is alleged to have violated."  Instead, Plaintiff offers "five sweeping assertions of purported breaches of University policy."  Those claims, Defendant insists, "are . . . entirely unsupported by any plausible factual allegations."  Moreover, those sorts of allegations are "too general to form the basis of a breach of contract claim."  Plaintiff counters that he has pointed to specific bases for the agreement between the parties and has sufficiently alleged how the University breached those promises.[6]  The Court will address each of the five promises that Syracuse allegedly breached in turn.

> i. **Opportunity to View the Evidence Gathered, to view the Investigation Report, and Submit a Written Response to Each**

_____

[6]The Court notes that, of the five promises allegedly breached in the Complaint, only one–a failure to provide an opportunity to appeal–references a concrete promise. The decision below explains why Plaintiff has not stated a claim with respect to that promise.  The Court finds that the other promises alleged in the Complaint are the sorts of general ethical statements that do not create a contract under these circumstances.

Plaintiff contends that Defendant breached this provision of the contract between the parties. While he had an opportunity to respond to the investigation's report, this opportunity was illusory and "effectively ignored." Plaintiff submitted a response that identified numerous inconsistencies and asked the investigator to "ask Roe follow up questions regarding these inconsistences," which the investigator allegedly ignored. He contends that "the University cannot skirt its contractual obligations by merely providing the appearance of an *opportunity* if that opportunity is meaningless." He does not cite to any New York contract law that supports this proposition.

Even assuming that the Defendant agreed to provide Defendant with an opportunity to view the evidence gathered and the report created, and to object to the report's findings, the Plaintiff here admits that he had an opportunity to view the evidence and report and to provide his objections. That the response to his objections did not result in a change to the report's conclusions does not represent a breach-of-contract claim. Plaintiff's Title IX claims deal with his dissatisfaction with the outcome of the investigation. Here, Plaintiff admits that the Defendant provided him with access to the report and an opportunity to dispute the findings. He has not alleged a breach of contract in this respect.

### ii.    Fair and Impartial Investigation

Plaintiff next contends that the University failed to provide a "fair and impartial investigation" as promised by the policies cited above. He contends that the University failed to meet this promise by having an investigation led by a biased investigator who did not properly credit the claims of various witnesses, and that the investigation be conducted without gender bias. This alleged contract term represents the sort of general statement of

policy which New York law dictates cannot form the basis of a viable contract claim. See Gally v. Columbia University, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).  "[G]eneral promises about ethical standards . . . are far different from the types of specific promises which have led to valid breach of contract claims against universities."  Gally, 22 Fed. Supp.2d at 207.  Such "'[g]eneral policy statements' and 'broad and unspecified procedures and guidelines'" do not create a contract under New York law.  Nungesser v. Columbia Univ., 244 F. Supp. 2d 345, 373 (S.D.N.Y. 2017) (quoting Ward v. New York Univ., 2000 U.S. Dist. LEXIS 14067, 2000 WL 1449641, at *4 (S.D.N.Y. Sept. 28, 2000)).  Such statements are "subject to neither quantification nor objective evaluation.'" Gally, 22 Fed. Sup.2d at 208.  Plaintiff's claim in this respect points only to a generalized promise for the type of investigation that will occur.  Such a promise does not create a contract under New York law and cannot support a contract claim.  Moreover, in New York, provisions that students will be treated in a "fundamentally fair" manner, or in a manner that is consistent with fundamental "student rights," are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach-of-contract claim. See, e.g. Ward, 2000 WL 1448641, at *4.

### iii. "Serious Treatment" of Claims

Plaintiff contends that Syracuse breached a promise that he would "have disclosures of Dating or Domestic Violence, Stalking, Sexual Assault, and other forms of Sexual Harassment treated seriously."  The "vastly different" way that Syracuse treated his claim and Roe's claim, Plaintiff argues, demonstrates that the University did not take his claim seriously.  Like the promise of a fair and impartial investigation, the promise of "serious treatment" does not create an enforceable contract provision under New York law.  This is

33

mereley a general statement of principle, which cannot be measured or quantified.  Plaintiff admits that Syracuse did investigate his claim and provided a hearing.  He disliked the outcome, but under these circumstances, he has not alleged facts constituting a breach.

> **iv.  Freedom from the Suggestion that Reporting Individual Should have Acted Differently to Avoid Being Mistreated**

Plaintiff next alleges that Syracuse breached a promise to "keep students free from any suggestion that the reporting individual is at fault when these crimes and violations are committed or should have acted in a different manner to avoid such crimes or violations." He complains that at the hearing, Roe was treated as a victim, with gentle questions, while he was "grilled with victim-shaming questions."  The Court again finds that this a generalized promise and a statement of an ethical standard that is not subject to enforcement as a contractual promise.  Plaintiff fails to state a claim upon which relief could be granted in this respect.

> **v.  Appeal**

Finally, Plaintiff alleges that Syracuse breached a promised to provide "access [to] at least one level of appeal of a determination."  Plaintiff contends that "the University limited the length of Plaintiff's appeal as to make it impossible for Doe to adequately address all of the procedural shortcomings of the investigation."  These limitations meant that the University failed to provide him with a meaningful opportunity to appeal.  Plaintiff here complains about the outcome of his appeal, but also admits that Defendant provided him with the promised opportunity to appeal.  He cannot state a claim on this basis.  The motion will be granted in this respect as well.

Plaintiff also alleges that Syracuse breached an implied contract of good faith and

34

fair dealing.  In New York, all contracts contain an implied covenant of good faith and fair dealing, meaning that neither party will "act arbitrarily or irrationality" in using discretion conferred by the contract terms.  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E. 2d 289, 291 (1995).  Under the rule, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Moran v. Erk, 11 N.Y.3d 452, 456, 901 N.E.2d 187, 190 (2008).  A claim for a breach of the implied contract of good faith and fair dealing is "duplicative" of a "breach of contract [claim]" that "arises from the same set of operative facts."  MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A3d 287, 297 (1st Dept. 2011).  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002).  "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same fats, the latter claim should be dismissed as redundant."  Cruz v. Fxdirectdealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).  That situation applies here, and the Court will dismiss any claim for implied breach of the covenant of good faith and fair dealing that Plaintiff alleges to have pled.

The Court will therefore grant Defendant's motion with respect to the contract claim. Since the Plaintiff has admitted facts which make his contract claims impossible to prove, the Court will grant that portion of the motion with prejudice.

### C.    New York Human Rights Law

Plaintiff also raises claims under the New York Human Rights Law.  The parties agree that Plaintiff's state-law claims here, which allege sex discrimination in the way that

Syracuse handled the allegations against him, are evaluated under the same standard as Plaintiff's Title IX claims.  As such, the Court will deny the motion with respect to Plaintiff's erroneous outcome claim and grant the motion with leave to re-plead with respect to Plaintiff's selective enforcement claim.

## V.    CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss, dkt. # 20, is hereby **GRANTED in part** and **DENIED in part**.  The motion is hereby **GRANTED** with prejudice with respect to Plaintiff's contract claim.  The motion is hereby **GRANTED** with leave to replead with respect to Plaintiff's selective enforcement claim under Title IX and the New York Human Rights Law.  The motion is **DENIED** in all other respects.  If Plaintiff elects to re-plead his selective enforcement claim, he shall file an Amended Complaint within 21 days of the date of this Order.[7]  If Plaintiff fails to file an Amended Complaint within the time specified in this Order, the Court will deem Plaintiff's selective enforcement claim dismissed with prejudice.

**IT IS SO ORDERED.**

---

[7]If Plaintiff elects to re-plead, he must assert sufficient factual allegations directed to the deficiencies addressed above.  See FED. R. CIV. P. 11(b)(3)("By presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.").

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: June 21, 2023